**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

FORREST A K WELLS, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

SEASTAR MEDICAL HOLDING CORPORATION, ERIC SCHLORFF, and CARYL BARON,

Defendants.

Civil Action No. 1:24-cv-01873-RMR-TPO

JURY TRIAL DEMANDED

---

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

---

## TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 3

III. THE PARTIES ..... 4

- A. Plaintiff ..... 4
- B. Defendants ..... 4

IV. SUBSTANTIVE ALLEGATIONS ..... 6

- A. LMAO, the SPAC ..... 6
- B. SeaStar Goes Public Via LMAO De-SPAC Transaction ..... 10
- C. Subscription Agreements and Forward Purchase Agreements Executed in Connection with the Business Combination ..... 17
- D. SeaStar's Materially Misstated Financial Reporting ..... 24
- E. Defendants Mislead Investors as to the Strength, Viability, and Readiness of SeaStar's HDE Application and the Progress of its Regulatory Review ..... 37
- F. The Truth About SeaStar's Deficient HDE Application Begins to Leak Out ..... 51
- G. The Company Reveals the Restatement of its Prior Financial Reports ..... 56

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ..... 62

VI. ADDITIONAL ALLEGATIONS PROBATIVE OF SCIENTER ..... 89

- A. SeaStar Had Ample Time to Study and Evaluate ASC Topic 815 ..... 90
- B. The Individual Defendants Certified SeaStar's Class Period Statements ..... 95
- C. Suspicious Timing of Senior-Level Departures, the Termination of LMAO's Independent Accounting Firm and Subsequent Resignation of SeaStar's Independent Accounting Firm ..... 97
- D. The Company's Prior Restatement of Financial Results Due to Misclassification of Financial Instruments ..... 100
- E. The Magnitude of the Restatement ..... 109
- F. The Individual Defendants' High-Level Positions and Access to Information ..... 110
- G. The Regulatory Approval Process Was Critical to SeaStar's Core Operations ..... 113
- H. SEC Correspondence Indicated Misleading Nature of Defendants Statements ..... 114

I. Defendants' Financial Motive to Commit Fraud ....................................... .115
VII. LOSS CAUSATION AND ECONOMIC LOSS ........................................................122
VIII. NO STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE ............124
IX. PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET DOCTRINE .............125
X. CLASS ACTION ALLEGATIONS.............................................................................126
XI. CLAIMS FOR RELIEF...........................................................................................129
XII. PRAYER FOR RELIEF ..........................................................................................134
XIII. DEMAND FOR TRIAL BY JURY ...........................................................................135

Lead Plaintiff Raffi Khajerian ("Plaintiff"), individually and on behalf of all others similarly situated, together with additional named plaintiff Breck Hudson, by and through their undersigned attorneys, allege the following based upon personal knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by and through their counsel, which included, *inter alia*: (a) review and analysts of relevant filings made by SeaStar Medical Holding Corporation ("SeaStar" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of SeaStar's public documents, presentations, announcements, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories and other media reports concerning the Company; (d) industry reports and regulatory guidance; and (e) information readily obtainable on the internet. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## I. NATURE OF THE ACTION

1. This is a federal securities class action lawsuit brought on behalf of a class consisting of all persons or entities who purchased or otherwise acquired SeaStar securities between October 31, 2022 and April 16, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' (defined below) violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC.

2. Hundreds of private companies transformed into publicly-traded corporations during the "SPAC craze" earlier this decade. SPACs, or Special Purpose Acquisition Companies, are shell corporations formed for the sole purpose of raising money to acquire a private company and take it public. This process allows for virtual instant access to public equity markets while bypassing the scrutiny and regulatory oversight normally associated with traditional initial public offerings. Early investors in the shell entity are frequently the ones who profit the most while retail shareholders shoulder the risk of failure once the target entity goes public. That is precisely what happened with SeaStar.

3. LMF Acquisition Opportunities, Inc. ("LMAO") was the SPAC entity responsible for SeaStar's public debut. The entity was formed in October 2020 and after several failed attempts at finding an acquisition target in the financial services industry, landed on SeaStar, a nascent medical device manufacturer. By early-2022, LMAO and SeaStar had entered into a non-disclosure agreement and negotiations for the acquisition were well underway. In April 2022, the two companies announced their plan to merge alongside grandiose claims about SeaStar's enterprise valuation and prospects for medical device approvals, specifically SeaStar's Selective Cytopheretic Device ("SCD").

4. The truth behind these claims was quite different. Following the merger, SeaStar (as the surviving entity) started trading publicly on the NASDAQ stock market.

Public investors who purchased shares in the company did so based on false and/or materially misleading information. This included false financial statements and misrepresentations concerning the regulatory status of SeaStar's flagship SCD product. The truth concerning SeaStar's financials and business came to light only later in the Class Period and, unfortunately for investors, only after SeaStar's stock price sank to record-low levels.

## II. <u>JURISDICTION AND VENUE</u>

5. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.

6. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

7. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). During all times relevant hereto, SeaStar maintained its headquarters in Denver, Colorado, and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in this District.

8. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities markets.

## III. THE PARTIES

### A. Plaintiffs

9. Lead Plaintiff Raffi Khajerian, as set forth in his previously filed certification, incorporated by reference here, purchased SeaStar securities during the Class Period and because of the violations of the federal securities laws alleged herein, suffered damages as a result.

10. Additional named plaintiff Breck Hudson purchased SeaStar securities during the Class Period, as set forth in his certification filed herewith and incorporated herein by reference. Additional named plaintiff Breck Hudson suffered damages as a result of the federal securities laws violations alleged herein.

### B. Defendants

11. Defendant SeaStar Medical Holding Corporation is a Delaware corporation with principal executive offices located at 3513 Brighton Boulevard, Suite 410, Denver, Colorado 80216. The Company's common stock and warrants trade in an efficient market on the NASDAQ under the ticker symbols "ICU" and "ICUCW," respectively.

12. Defendant Eric Schlorff ("Schlorff") has, at all relevant times, served as SeaStar's Chief Executive Officer ("CEO") and as a member of the Company's Board of Directors. Prior to the consummation of the Business Combination on October 28, 2022, Mr. Schlorff had served as a Director and CEO of SeaStar Medical Inc. ("SeaStar Legacy") since July 2019; as Chief Operating Officer from March 2019 to July 2019; and a Director from June 2016 to May 2019.

13. Defendant Caryl Baron ("Baron") served as SeaStar Legacy's Finance Controller from 2020 until the consummation of the Business Combination on October 28, 2022, at which point she was appointed as the Company's Interim Chief Financial Officer ("CFO"), a position she served in until January 10, 2024, when she was transitioned to Vice President ("VP") of Finance. Ms. Baron served as SeaStar's VP of Finance from January 10, 2024 until her termination effective April 23, 2024. Since 2013, Ms. Baron has also served as the Founder of Baroness Financial Consulting, an accounting consulting firm.

14. Defendants Schlorff and Baron are collectively referred to herein as the "Individual Defendants."

15. SeaStar, together with the Individual Defendants, are referred to herein as "Defendants."

16. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of SeaStar's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of SeaStar's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were

being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17. SeaStar is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to SeaStar under *respondeat superior* and agency principles.

## IV. SUBSTANTIVE ALLEGATIONS

### A. LMAO, the SPAC

19. The publicly traded company now known as SeaStar, initially operated as a special purpose acquisition company ("SPAC") under the name LMF Acquisition Opportunities, Inc. ("LMAO").

20. LMAO was a self-described "blank check company" organized under the General Corporation Law of the State of Delaware on October 28, 2020, for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses. Upon formation, LMAO expressed intentions to focus initially on transactions with companies and/or assets within the financial services industry, including potentially the financial

technology ("FinTech") sector, and related sectors. *See*, *e.g.*, Form S-1, Registration Statement, dated November 30, 2020.

21. John Coates, speaking as Acting Director of the SEC's Division of Corporate Finance, described the SPAC structure as follows:

> The basics of a typical SPAC are complex, but can be simplified as follows. A SPAC is a shell company with no operations. It proceeds in two stages. In the first stage, it registers the offer and sale of redeemable securities for cash through a conventional underwriting, sells them primarily to hedge funds and other institutions, and places the proceeds in a trust for a future acquisition of a private operating company. Initial investors also commonly obtain warrants to buy additional stock as at a fixed price, and sponsors of the SPAC obtain a "promote" – greater equity than their cash contribution or commitment would otherwise imply – and their promote is at risk. If the SPAC fails to find and acquire a target within a period of two years, the promote is forfeited and the SPAC liquidates. About ten percent of SPACs have liquidated between 2009 and now.
>
> But most SPACs since 2009 have gone on to identify acquisition candidates. In their second stage, SPACs complete a business combination transaction, in which the SPAC, the target (i.e., the private company to be acquired), or a new shell "holdco" issues equity to target owners, and sometimes to other investors. SPAC shareholders typically have a vote on the so-called "de-SPAC" transaction, and many investors who purchased securities in the first stage SPAC either sell on the secondary market or have their shares redeemed before or shortly after the de-SPAC. After the de-SPAC, the entity carries on its operations as a public company. In this way, SPACs offer private companies an alternative pathway to "go public" and obtain a stock exchange listing, a broader shareholder base, status as a public company with Exchange Act registered securities, and a liquid market for its shares.[1]

22. The SPAC structure also creates manager incentives to pursue a target that many not be in investors' best interest, and to avoid disclosures that may dissuade

[1] John Coates, "SPACS, IPOs and Liability Risk Under Securities Laws," (April 8, 2021) https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (footnotes omitted).

investors from exchanging shares in the merger. If a merger is completed within the allocated time frame, founders and managers of the SPAC generally reap windfall profits from their ownership of SPAC securities they obtained cheaply prior to public offering and enjoy considerable control such as the ability to nominate board members to the new company. However, if an acquisition is not effectuated within that time frame, then the SPAC is dissolved and the money in the company's trust account is returned to its investors, with no compensation paid to the founders and managers of the SPAC. Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the transaction may be to the detriment of the public shareholders.

23. The SPAC structure does not require a shareholder to exchange pre-merger SPAC shares into shares of the merged company. Instead, after what is supposed to be full disclosure of material information, such holders are afforded the opportunity to redeem shares prior to exchange. The redemption of shares directly impacts the working capital of the merged company and indirectly impacts the economic interests of SPAC sponsors. As a result, SPAC sponsors and merger targets are highly incentivized to minimize the number of exercised redemptions.

24. Private companies seeking to go public have increasingly turned to de-SPAC transactions in recent years. De-SPAC transactions are faster than traditional IPOs, the price is determined in advance instead of by the volatile market, and SPAC sponsors often have a network of contacts and management expertise they can offer to the new company. However, SPAC mergers also have the potential to be rife with

inaccurate disclosures, as the process allows companies to sidestep traditional underwriting and regulatory scrutiny. SEC officials have also expressed concern over the recent surge in SPACs, in particular, about the "baseless hype" by which many are sold.[2]

25. On January 27, 2021, LMAO completed its initial public offering ("IPO"), generating gross proceeds of $103,500,000 by selling 10,350,000 units (including an initial 9 million units plus an additional 1.35 million units offered and exercised by underwriters) at a price of $10.00 per unit, each consisting of one share of Class A common stock and one redeemable warrant, with each warrant exercisable for one share of Class A common stock at a price of $11.50 per share. Simultaneously, LMAO consummated the sale of 5,738,000 private placement warrants ("Private Placement Warrants"), at a price of $1.00 per warrant, generating gross proceeds of $5,738,000. In total, LMAO generated approximately $109.2 million in gross proceeds in connection with its IPO.

26. Following the completion of its IPO, LMAO placed $105,570,000 in the company's trust account. Nasdaq rules required that LMAO complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of the company's signing a definitive agreement in connection with its initial business combination.

---

[2] *See* Coates, *supra*.

27. LMAO had until 18 months from the closing of its initial offering to consummate an initial business combination. However, if anticipated that it may not be able to consummate a merger within the allotted timeframe, LMAO had the option to extend the period of time to consummate a business combination by an additional three months (for a total of 21 months), subject to the company's sponsor depositing an additional $1,035,000 into the trust account.

28. On July 29, 2022, LMAO announced that its board of directors elected to extend the date by which the company had to consummate a business combination from July 29, 2022 to October 29, 2022. In connection with the extension, the company's sponsor, LMFAO Sponsor, LLC, deposited an aggregate $1,035,000 (representing $0.10 per public share) into the company's trust, to be repaid upon completion of an initial business combination.

**B. SeaStar Goes Public Via LMAO De-SPAC Transaction**

29. LMAO completed its IPO with plans to "focus on acquiring a business combination target within the financial services industry, like the FinTech sector or a related sector, with an enterprise value of approximately $250 million to $500 million." *See* Prospectus, dated January 27, 2021.

30. Between January 28, 2021 and April 22, 2022, LMAO's directors and officers met weekly to review referrals of potential acquisition targets, resulting in a list of 150 potential targets, approximately 117 of whom were willing to enter into preliminary discussions. During this time, LMAO entered into non-disclosure

agreements with a total 31 target companies after preliminary discussions and review of publicly available information.

31. On September 23, 2021, a representative on behalf of SeaStar Legacy contacted LMAO's management team about the merits of a potential business combination. SeaStar Legacy was a medical technology company focused primarily on developing and commercializing its lead product candidate, the Selective Cytopheretic Device ("SCD"), for pediatric and adult acute kidney injury ("AKI") indications. SeaStar Legacy had not yet obtained regulatory approval to commercialize or sell any of its product candidates.

32. That same day, LMAO's management team and Martin Traber, an LMAO board member and Chairman of Skyway Capital, LLC ("Skyway"), a Tampa, Florida-based investment banking firm, discussed SeaStar Legacy internally and held informal discussions with members of Skyway's health care team, to discuss, among other things, the medical device industry and valuation methodologies. Based upon publicly available information and its informal discussions with Skyway, LMAO initially valued SeaStar Legacy between $100 million to $125 million based upon comparable public company valuations. Based on these preliminary, informal discussions and initial review of publicly available information and comparable valuations, LMAO's board believed that the other target companies under review at such time were more desirable acquisition candidates.

33. Consequently, later that same day, Bruce Rodgers, CEO, President and Chairman of LMAO, informed SeaStar Legacy, that LMAO did not desire to engage in

any substantive discussions with SeaStar Legacy until it substantially completed a Public Company Accounting Oversight Board ("PCAOB") audit, which LMAO claimed to require for all targets.

34. Thereafter, LMAO continued its detailed discussions with and due diligence of its target acquisition candidates, until the termination of each non-binding letter of intent ("LOI") sent. Indeed, LMAO submitted indications of interest or intent to nine (9) other acquisition candidates prior to entering into a non-disclosure agreement with SeaStar Legacy.

35. Specifically, LMAO sent a LOI to Company A on March 4, 2021 and on March 10, 2021, Company A informed LMAO of their decision to proceed with a different business combination. On March 18, 2021, LMAO sent Company B a LOI and on April 27, 2021, Company B informed LMAO of its decision to proceed with a private round of funding and remain a private company for the foreseeable future. On April 7, 2021, LMAO sent Company C a LOI and on September 29, 2021, Company C informed LMAO of its decision to remain a private company. On April 7, 2021, LMAO also sent Company D a LOI and on August 11, 2021, Company D informed LMAO's management team of its decision to pursue an alternative transaction route. On May 3, 2021, LMAO sent Company E a LOI and when Company E sought to increase the merger consideration from what was agreed to in the LOI, on August 23, 2021, LMAO's management team notified Company E that it was terminating the deal. On August 24, 2021, LMAO sent Company F a LOI and on September 21, 2021, Company F informed LMAO of its decision to remain a private company. On October 28, 2021, LMAO sent

Company G a LOI and on November 11, 2021, Company G informed LMAO of its decision to remain a Canadian-listed issuer for the foreseeable future. On November 30, 2021, LMAO sent Company H a LOI and on April 8, 2022, Company H informed Mr. Rodgers of its decision to remain a private company. On February 11, 2022, LMAO sent Company I a LOI and on February 24, 2022, Company I informed LMAO of its decision to remain a private company.

36. On February 8, 2022, SeaStar Legacy contacted LMAO's management team again regarding a potential business combination, providing LMAO with further information about SeaStar Legacy and its lead product candidate, the SCD.

37. On February 10, 2022, LMAO entered into a non-disclosure agreement with SeaStar Legacy, and on that date, LMAO's management team held an initial videoconference with SeaStar Legacy's executive management team (including the Individual Defendants) and representatives from its financial advisor, Maxim Group LLC ("Maxim").

38. During this February 10, 2022 meeting, SeaStar Legacy's management team informed LMAO that it had substantially completed its PCAOB audit, as requested, was seeking a pre-money enterprise value of $85 million, and that the pension plans of the Dow Chemical Company, Dow Employees' Pension Plan Trust and Union Carbide Employees' Pension Plan (collectively, "the Dow Pension Funds") (an existing investor of SeaStar Legacy), had indicated that it would make a PIPE investment of $5 million at this valuation.

39. On February 23, 2022, LMAO sent SeaStar Legacy a LOI, which was executed by SeaStar Legacy's management team on March 1, 2022, and LMAO's management team on March 2, 2022. For the next two months, the companies proceeded to have several more discussions regarding the terms of the proposal, SeaStar Legacy's valuation, and a business combination structure. Representatives of LMAO and its advisors conducted further analysis and held conference calls with representatives of SeaStar Legacy regarding its business plan, regulatory approval process, financial projections and technology and continued their business, financial, accounting, tax, and legal due diligence investigations of SeaStar Legacy.

40. On April 21, 2022, LMAO, LMF Merger Sub, Inc., a Delaware corporation and wholly owned subsidiary of LMAO ("Merger Sub"), and SeaStar Legacy executed the Agreement and Plan of Merger (the "Merger Agreement") and certain of the related agreements. Upon the closing of the transactions contemplated by the Merger Agreement, Merger Sub would merge with and into SeaStar Legacy (the "Business Combination") with SeaStar Legacy surviving the merger. In connection with the consummation of the Business Combination, the combined company would be known as "SeaStar Medical Holding Corporation," operating under the same management team as SeaStar Legacy, and with all SeaStar Legacy shares owned by existing equity holders to be converted into Class A common stock of the combined company.

41. The next day, LMAO announced that it had entered into the Merger Agreement with SeaStar Legacy. The press release indicated that the transaction had been unanimously approved by both Boards of Directors of SeaStar Legacy and LMAO

and was subject to approval by stockholders of LMAO and other customary closing conditions, but holders of a majority of the SeaStar Legacy voting power had already approved the merger.

42. LMAO and SeaStar Legacy touted the overall prospects of the combined company following the Business Combination, asserting that SeaStar Legacy had an enterprise value of approximately $85 million, while highlighting SeaStar Legacy's SCD for the treatment of hyperinflammation and the SCD's regulatory and commercial prospects. For example, the companies announced that SeaStar Legacy intended to submit, to the U.S. Food & Drug Administration (the "FDA"), a pre-market approval application under the Humanitarian Device Exemption ("HDE") to commence commercialization of SCD in the treatment of pediatric AKI, and to advance a pivotal trial of SCD for treatment of AKI in adults.

43. On July 20, 2022, LMAO and SeaStar Legacy jointly announced that SeaStar Legacy had submitted the HDE application to the FDA for use of SeaStar Legacy's SCD for critically ill children with AKI, which purportedly "follow[ed] [a] successful pilot study demonstrating the SCD was safe with probable clinical benefits for pediatric patients[.]" The press release also indicated that the FDA had informed SeaStar Legacy that the agency had accepted the application and would begin its review.

44. On October 18, 2022, following purported positive regulatory developments, further supporting SeaStar Legacy's $85 million valuation, LMAO announced that its stockholders had voted to approve the Business Combination. That

day, LMAO held a special meeting of its stockholders, at which holders of 10,331,745 common stock (consisting of 7,744,245 shares of Class A common stock and 2,587,500 shares of Class B common stock) were present in person or by proxy, representing 79.22% of the voting power of LMAO's common stock. According to the company's announcement, more than 96% of the votes cast at the meeting voted to approve the Business Combination.

45. On October 28, 2022, LMAO and SeaStar Legacy consummated the Business Combination pursuant to the Merger Agreement, whereby SeaStar Legacy's business, operations, and management became LMAO's business, operations, and management, and the combined company was renamed to "SeaStar Medical Holding Corporation." Specifically, following the closing of the Business Combination, Defendant Schlorff, CEO of SeaStar Legacy, was to become CEO and a member of the Board of Directors of the combined company. Likewise, Defendant Baron, Finance Controller of SeaStar Legacy, was to become Interim CFO of the combined company. Notably, following the closing of the Business Combination, existing directors and executive officers of LMAO, including Bruce Rodgers (CEO, President, and Chairman of LMAO) and Richard Russell (CFO, Treasurer, Secretary, and Director) became members of the Board of Directors of the combined company.

46. The following trading day, October 31, 2022, the Company's common stock and warrants began publicly trading on the NASDAQ.

**C. Subscription Agreements and Forward Purchase Agreements Executed in Connection with the Business Combination**

47. In connection with the Business Combination, LMAO entered into subscription agreements allowing for the private placement of shares of Class A common stock and warrants to purchase Class A common stock of LMAO.

48. On August 24, 2022, LMAO announced that, in connection with the Business Combination, LMAO had entered into subscription agreements, each dated August 23, 2022 (collectively, the "Subscription Agreements"), with certain third-party investors (the "PIPE Investors"), pursuant to which LMAO agreed to issue and sell, and the PIPE Investors agreed to purchase, in private placements to close immediately prior the closing date of the merger, an aggregate of 700,000 shares of LMAO's Class A common stock, $0.0001 par value per share, at $10.00 per share, and warrants to purchase up to 700,000 shares of the Class A common stock (the "PIPE Warrants") for an aggregate purchase price of $7,000,000 (the "PIPE Investment").

49. Specifically, the Dow Pension Funds agreed to purchase an aggregate $5,000,000 in the PIPE Investment, and Tumim Stone Capital LLC ("Tumim") agreed to purchase the aggregate remaining in the PIPE Investment.

50. The PIPE Warrants were exercisable starting on the closing date of the Business Combination at an exercise price of $11.50 per share of common stock, subject to adjustment in certain circumstances, and expire five years after the closing of the merger.

51. On September 28, 2022, LMAO filed a Proxy Statement/Prospectus Supplement ("Prospectus Supplement") with the SEC which incorporated important business and financial information about LMAO and the proposed Business Combination with SeaStar Legacy. The Prospectus Supplement explained, in relevant part, that LMAO's "PIPE Warrants are identical to the Private Placement Warrants in material terms and provisions, except that the Private Placement Warrants cannot be transferred, assigned or sold until 30 days after the Business Combination (except in limited circumstances) and will not be redeemable by LMAO so long as they are held by the company's sponsor or any of its permitted transferees."

52. When discussing "*Warrants Classified as Derivative Liabilities*," the Prospectus Supplement provided, in pertinent part, that:

> The Company's management has evaluated both the Public Warrants and the Private Placement Warrants using ASC Subtopic 815-40, Contracts in Entity's Own Equity. ASC Section 815-40-15 addresses equity versus liability treatment and classification of equity-linked financial instruments, including warrants, and states that a warrant may be classified as a component of equity only if, among other things, the warrant is indexed to the issuer's common stock. Under ASC Section 815-40-15, a warrant is not indexed to the issuer's common stock if the terms of the warrant require an adjustment to the exercise price upon a specified event and that event is not an input to the fair value of the warrant. The Company concluded that the Company's Private Placement Warrants are not indexed to the Company's common shares in the manner contemplated by ASC Section 815-40-15 because the holder of the instrument is not an input into the pricing of a fixed-for-fixed option on equity shares. In addition, based on management's evaluation, the Company also concluded the tender offer provision included in the warrant agreement fails the 'classified in stockholders' equity' criteria as contemplated by ASC Section 815-40-25.
>
> As a result of the above, the Company has classified the warrants as derivative liabilities.

53. Further, the Prospectus Supplement explicitly stated that, "[t]he LMAO private warrants and PIPE Warrants would continue to be classified as liabilities following the Business Combination because their settlement amount differs depending on the identity of the holder."

54. Likewise, in connection with the Business Combination, LMAO and SeaStar Legacy entered into forward purchase agreements with third parties allowing for the purchase or reversed redemption of shares of Class A common stock and warrants to purchase Class A common stock of LMAO.

55. On October 17, 2022, LMAO, SeaStar Legacy and Vellar Opportunity Fund SPV LLC ("Vellar") entered into an agreement for an equity prepaid forward transaction (the "Vellar Prepaid Forward Agreement"). Pursuant to the terms of the agreement, Vellar was permitted to purchase, through a broker in the open market, shares of Class A common stock, par value $0.0001 per share, of LMAO, each of which included one redeemable warrant (together with the shares of common stock and public warrants of the Company following the closing of the Business Combination, the "Shares"), from holders of Shares, other than LMAO or its affiliates, including from holders who have previously elected to redeem Shares pursuant to the redemption rights set forth in LMAO's Amended and Restated Certificate of Incorporation dated as of January 26, 2021, as amended, in connection with the Business Combination (such purchased Shares, the "Recycled Shares"). The aggregate total Recycled Shares that could be acquired under the Vellar Prepaid Forward Agreement was no more than 1,500,000 shares (the "Maximum Number of Shares").

56. The Vellar Prepaid Forward Agreement provided that, Vellar was to be paid directly, out of the funds held in LMAO's trust account, (i) a cash amount (the "Prepayment Amount") equal to the Number of Shares multiplied by the Per-Share Redemption Price (the "Redemption Price"), as defined in Section 9.2(b) of the Amended and Restated Certificate, no later than the earlier of (a) one (1) local business day after the closing of the Business Combination and (b) the date any assets from LMAO's trust account are disbursed in connection with the Business Combination; (ii) an amount equal to the product of 100,000 multiplied by the Redemption Price (the "Share Consideration"), for the purpose of repayment of Vellar purchasing, prior to the closing of the Business Combination, 100,000 additional Shares (the "Additional Shares") from third parties in the open market through a broker, which Shares shall be free and clear of all obligations of Vellar in connection with the Vellar Prepaid Forward Agreement; and (iii) a structuring fee in the amount of $5,000 at closing and on the first business day of each quarter.

57. Pursuant to the Vellar Prepaid Forward Agreement, Vellar had the option to sell Recycled Shares that it purchased, the effect of which was to terminate the agreement in respect of such Recycled Shares sold (the "Terminated Shares"). SeaStar was entitled to receive proceeds from such sales of Terminated Shares equal to the product of (x) the number of Terminated Shares multiplied by (y) the "Reset Price" – which was initially set at $10.00 per Share, but adjusted on the last scheduled trading day of each month commencing on the first calendar month following the Business Combination to the lowest of (a) the then-current Reset Price, (b) $10.00 and (c) the

volume weighted average price ("VWAP Price") of the Shares of the last ten (10) trading days of the prior calendar month, but not lower than $5.00.

58. The maturity date of the transaction with Vellar (the "Maturity Date") was to be the earliest to occur of (a) the third anniversary of the closing of the Business Combination and (b) the date following the effective date specified by Vellar in a written notice to be delivered at Vellar's discretion after any occurrence wherein during any 30 consecutive trading-day period, the VWAP Price for 20 trading days is less than $3.00 per Share (a "VWAP Trigger Event"). Upon the occurrence of the Maturity Date, SeaStar was obligated to pay to Vellar an amount equal to the product of (a) (x) the Maximum Number of Shares less (y) the number of Terminated Shares multiplied by (b) $2.50 (the "Maturity Consideration").

59. On October 18, 2022, LMAO filed a current report on Form 8-K with the SEC providing that, as of October 17, 2022, holders of an aggregate of 10,257,655 shares of Class A common stock had exercised their right to redeem their shares but was subsequently made aware that certain holders of Class A common stock may request to change their redemption election.

60. On October 26, 2022, LMAO, SeaStar Legacy and HB Strategies LLC ("HB Strategies") entered into an agreement for an equity prepaid forward transaction (the "HB Strategies Prepaid Forward Agreement"). Pursuant to the terms of the agreement, HB Strategies was permitted to (i) purchased, through a broker in the open market, Recycled Shares from holders of Shares, other than LMAO or its affiliates, or (ii) reverse HB Strategies' prior exercise of redemption rights as to Shares. The Maximum

Number of Shares that could be purchased or reversed under the HB Strategies Prepaid Forward Agreement was no more than 700,000 Shares.

61. The HB Strategies Prepaid Forward Agreement provided that, HB Strategies was to be paid directly, out of the funds held in LMAO's trust account, (i) a cash amount (the "Prepayment Amount") equal to the Number of Shares multiplied by the Per-Share Redemption Price (the "Redemption Price"), as defined in Section 9.2(b) of the Amended and Restated Certificate, no later than the earlier of (a) one (1) local business day after the closing of the Business Combination and (b) the date any assets from LMAO's trust account are disbursed in connection with the Business Combination; (ii) an amount equal to the product of 50,000 multiplied by the Redemption Price (the "Share Consideration"), for the purpose of repayment of HB Strategies purchasing in the open market or reversing its redemption election as to, prior to the closing of the Business Combination, 50,000 additional Shares (the "Additional Shares"), which Shares shall be free and clear of all obligations of HB Strategies in connection with the HB Strategies Prepaid Forward Agreement; and (iii) a structuring fee in the amount of approximately $3,000 at closing and on the first business day of each quarter.

62. Pursuant to the HB Strategies Prepaid Forward Agreement, HB Strategies had the option to sell its Recycled Shares (*i.e.*, Terminated Shares). SeaStar was entitled to receive proceeds from such sales of Terminated Shares equal to the product of (x) the number of Terminated Shares multiplied by (y) the Reset Price.

63. The Maturity Date of the transaction with HB Strategies was to be the earliest to occur of (a) the third anniversary of the closing of the Business Combination

and (b) the date following the effective date specified by HB Strategies in a written notice to be delivered at HB Strategies' discretion after any occurrence of an VWAP Trigger Event. Upon the occurrence of the Maturity Date, SeaStar was obligated to pay HB Strategies an amount equal to the product of (a) (x) the Maximum Number of Shares less (y) the number of Terminated Shares multiplied by (b) $2.50 (*i.e.*, Maturity Consideration).

64. On October 27, 2022, LMAO filed a current report on Form 8-K with the SEC providing that, as of October 26, 2022, holders of an aggregate of 8,878,960 Shares had exercised their right to redeem their Shares, after giving effect to any redemption reversals by stockholders to have requested to reverse their election to have their shares redeemed.

65. At the closing of the Business Combination, pursuant to the Vellar Prepaid Forward Agreement and the HB Strategies Prepaid Forward Agreement (together, the "Forward Purchase Agreements"), LMAO paid Vellar and HB Strategies (together, the "FPA Sellers"), out of funds held in the trust account, aggregate amounts of approximately $14.4 million, an amount equal to 1,173,400 Recycled Shares purchased, multiplied by $10.37 per share (*i.e.*, the Redemption Price), or approximately $12.2 million (*i.e.*, the Prepayment Amount), approximately $2.1 million for the purpose of repayment for the purchase of 200,000 Additional Shares from third parties in the open market (*i.e.*, Share Consideration), and reimbursement of legal expenses and a commission fee in the amount of approximately $0.2 million.

66. Specifically, pursuant to the Vellar Prepaid Forward Agreement, LMAO paid to Vellar, out of funds held in the trust account, an aggregate amount of $6,570,828.00 as the Prepayment Amount, Share Consideration, and reimbursement of certain expenses incurred, and pursuant to the HB Strategies Prepaid Forward Agreement, LMAO paid to HB Strategies, out of funds held in the trust account, an aggregate amount of $7,787,500.00 as the Prepayment Amount, Share Consideration, and reimbursement of certain expenses incurred.

67. In sum, pursuant to the Forward Purchase Agreements, the FPA Sellers collectively owned 1,173,400 shares that were subject to the termination and maturity terms of the Forward Purchase Agreements, entitling SeaStar to proceeds from the sales of Terminated Shares should the FPA Sellers choose to sell their Recycled Shares, but also obligating the Company to pay the FPA Sellers an amount equal to the product of the number of Shares held, less any Terminated Shares, multiplied by $2.50, upon the occurrence of the Maturity Date. Consequently, under the terms of the Forward Purchase Agreements, the equity forward in question was contingent on the occurrence of an event that was not certain to occur, and other future conditions required SeaStar to pay more than the fair value of the Shares at maturity.

## D. SeaStar's Materially Misstated Financial Reporting

68. Throughout the Class Period, SeaStar issued financial statements that were materially misstated and not presented in accordance with current Generally Accepted Accounting Principles ("GAAP"). The Individual Defendants also repeatedly signed management certifications regarding SeaStar's financial statements and the

adequacy of its internal controls, detailed in Section VI.B., *infra*, which were materially false and misleading as these sworn certifications concealed SeaStar's violations of GAAP.

69. GAAP is recognized by the accounting profession as conventions, rules and procedures necessary to define accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (FASB).

70. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not presented in accordance with GAAP will be "presumed misleading or inaccurate," despite footnotes or other disclosures.

71. SEC Regulation S-X also requires that interim financial statements filed with the SEC comply with GAAP. *See* 17 C.F.R. § 210.10-01(a).

72. As detailed herein, during the Class Period, SeaStar falsely represented that its financial statements were presented in conformity with GAAP. In addition, SeaStar misrepresented in its SEC filings that it adopted the provisions of GAAP's Accounting Standards Codification ("ASC") Topic 815.

73. According to the FASB, information about an entity's assets, liabilities, and equity and their relationships to each other at a moment in time helps investors to assess the entity's liquidity, financial flexibility, net resources available, the capability of generating future net cash flows, and exposures to risk. It also provides material information about the entity's ability to meet its long-term financial obligations.

74. "Recognition" is the process of incorporating an item in financial statements of a reporting entity as an asset, liability, equity, revenue, gain, expense, loss, or investment by or distribution to owners. A recognized item is depicted in both words and numbers, with the amount included in financial statement totals. For an asset or a liability, recognition involves recording the acquisition or incurrence of the item and later changes in the item.

75. According to the FASB, an item and its financial information should meet the following three recognition criteria to be recognized in the financial statements:

a. *Definitions*—The item meets the definition of an element of financial statements.

b. *Measurability*—The item is measurable with a relevant measurement system.

c. *Faithful Representation*—The item can be depicted and measured with faithful representation.

76. In general, the FASB defines an "asset" as a present right of an entity to an economic benefit. The combination of those two characteristics—a present right and a right to an economic benefit—entitles an entity to obtain the economic benefit and affords that entity the ability to control or restrict others' access to the benefit.

77. The FASB defines a "liability" as a present obligation of an entity to transfer or otherwise provide an economic benefit to others. Liabilities commonly have identifying features such as requiring the obligated entity to pay cash to one or more identified other entities. For example, a contractual obligation that requires an entity to pay more than the fair value of the asset at the transaction date may create a liability

before the asset is received, reflecting what the entity might have to pay to undo the unfavorable contract.

78. According to the FASB, the terms “equity” or “net assets” represent the residual interest in the assets of an entity that remains after deducting its liabilities.

79. According to an article issued by *The Wall Street Journal* on April 6, 2021, the classification of financial instruments on an entity’s balance sheet will affect how returns on that instrument are reflected in the entity’s income statement. Returns on liability-classified instruments are reflected in net income, whereas returns on equity-classified instruments are generally reflected in equity, without affecting net income. Dividends and remeasurement adjustments on equity securities that are classified as temporary equity may reduce an entity’s reported earnings per share (EPS). In addition to the effect on net income and EPS, entities often seek to avoid classifying capital securities as liabilities or temporary equity for other reasons, including the effect of the classification on the security’s credit rating and stock price; regulatory capital requirements; and debt covenant requirements (*e.g.*, leverage or capital ratios).

80. GAAP includes guidance that entities must consider in determining whether to recognize contracts that may be settled in their own stock, such as warrants, as equity of the entity or as an asset or liability. Specifically, ASC Topic 815 provides comprehensive guidance for all derivative instruments and hedging activities.

81. ASC 815-40 addresses equity versus liability treatment and classification of equity-linked financial instruments, such as warrants, options, convertible instruments, futures, forwards or embedded derivatives. An equity-linked financial

instrument (or embedded feature) must be: (1) considered indexed to an entity's own stock under ASC 815-40-15 and (2) meet the equity classification conditions under ASC 815-40-25, to qualify for accounting as equity.

82. Pursuant to ASC 815-40-15, reporting entities are required to evaluate the "indexed to the entity's own equity" requirement using a two-step approach. First, the entity must evaluate the instrument's contingent exercise provisions, if any. Second, the entity must evaluate the instrument's settlement provisions.

83. With respect to evaluating the instrument's settlement provisions, an instrument would be considered indexed to an entity's own stock if its settlement amount equals the difference between the fair value of a fixed number of the entity's equity shares and fixed monetary amount or a fixed amount of a debt instrument issued by the entity. This guidance is often referred to as the "fixed for fixed" rule. If the instrument's strike price or the number of shares used to calculate the settlement amount are not fixed, the instrument may still be considered indexed to an entity's own stock if the only variables that could affect the settlement amount would be inputs to the fair value of a fixed-for-fixed forward or option on equity shares. *See* ASC 815-40-15-7 through 815-40-15-7H.

84. ASC 815-40-15-7E discusses the exception to the "fixed for fixed" rule, stating: "The fair value inputs of a fixed-for-fixed forward or option on equity shares may include the entity's stock price and additional variables, including all of the following: (a) strike price of the instrument, (b) term of the instrument, (c) expected dividends or other dilutive activities, (d) stock borrow cost, (e) interest rates, (f) stock price volatility, (g) the

entity's credit spread, and (h) the ability to maintain a standard hedge position in the underlying shares."

85. In other words, this exception allows an instrument to be considered indexed to the reporting entity's own stock even if adjustments to the settlement amount can be made, provided those adjustment are based on standard inputs used to determine the value of a "fixed for fixed" forward or option on equity shares.

86. As described in detail below, on April 21, 2021, the SEC issued a Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs"), co-authored by John Coates, Acting Director, Division of Corporation Finance and Mr. Munter, Acting Chief Accountant. The April 21, 2021 SEC Statement explicitly concluded that "[b]ecause the holder of the instrument is not an input into the pricing of a fixed-for-fixed option on equity shares…such a provision would preclude the warrants from being indexed to the entity's stock, and thus the warrants should be classified as a liability measured at fair value, with changes in fair value each person reported in earnings."

87. Accordingly, as laid out in the Prospectus Supplement, because the settlement amount of the PIPE Warrants and Private Placement Warrants differs depending on the identity of the holder, and because under ASC 815-40-15, the holder of the instrument is not an input into the pricing of a fixed-for-fixed option on equity shares, the warrants are not considered indexed to the Company's common shares, and therefore require liability classification.

88. Despite these clear advisories and commentary by the SEC, coupled with the Company's prior proper application of ASC 815-40, throughout the Class Period, SeaStar considered the warrants as indexed to the Company's common stock. In doing so, SeaStar violated a fundamental tenet of ASC 815-40 and made material misrepresentations of fact stating that its recognition of the Company's outstanding PIPE Warrants and Private Placement Warrants met the conditions for equity classification.

89. For example, on March 30, 2023, the Company filed with the SEC an annual report for the fiscal year ended December 31, 2022 on Form 10-K ("FY22 10-K"). Under "Note 10. Warrants," the FY22 10-K stated, in relevant part:

> As part of LMAO's initial public offering, under the Warrant Agreement dated as of January 25, 2021 and, prior to the effectiveness of the Business Combination, LMAO issued 10,350,000 warrants each of which entitled the holder to purchase one share of common stock at an exercise price of $11.50 per share ("Public Stockholders' Warrants"). Simultaneously with the closing of the Initial Public Offering, LMAO completed the private sale of 5,738,000 million warrants each of which entitled the holder to purchase one share of common stock at an exercise price of $11.50 per share, to LMAO's sponsor ("Private Placement Warrants"). Upon the effectiveness of the Business Combination, the outstanding Public Stockholders' Warrants and Private Placement Warrants automatically converted into warrants of SeaStar Medical Holding Corporation. ***The Company has reviewed the terms of the warrants to determine whether the warrants should be classified as liabilities or stockholders' deficit in its consolidated balance sheets. In order for a warrant to be classified in stockholders' deficit, the warrant must be (a) indexed to the Company's equity and (b) meet the conditions for equity classification in ASC 815-40, Derivatives and Hedging-Contracts in an Entity's own Equity.*** If a warrant does not meet the conditions for equity classification, it is carried on the consolidated balance sheets as a warrant liability measured at fair value, with subsequent changes in the fair value of the warrant recorded in the consolidated statements of operations as change in fair value of warrants. ***The Company determined that the warrants are required to be***

> ***classified as stockholders' deficit as of the date of the Business Combination.*** The Company has the ability to redeem outstanding Public Shareholders' Warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that the last reported sales price of our common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, and the like) for any 20 trading days within a 30 day trading-day period. The Company does not have the ability to redeem the Private Placement Warrants. The Private Placement Warrants were valued at $6,688[,000] at the date of the Business Combination date. On December 31, 2022, there were 10,350,000 Public Shareholders' Warrants outstanding and 5,738[,000] Private placement Warrants outstanding.
>
> On October 28, 2022, the Company entered into a Private Investment in Public Equity ("PIPE") Agreement, pursuant to which the PIPE investors purchased an aggregate of 700,000 shares of common stock at $10.00 per share and received 700,000 PIPE Investor Warrants, which entitled the holder to purchase one share of common stock of SeaStar Medical Holding Corporation at $11.50 per share, for an aggregate purchase price of $7,000[,000]. At December 31, 2022, there were 700,000 PIPE Investor Warrants outstanding, ***which are accounted for as equity***.
>
> (Emphasis added).

90. As detailed herein, SeaStar has now admitted that, despite repeated representations to the contrary during the Class Period, "[d]uring the fiscal year ended December 31, 2023 and 2022, the Company has entered into or assumed as part of the Business Combination various financial instruments, in the form of warrant agreements, that require classification as liabilities. This classification requires that the Company measure the warrants at fair value at inception, and the remeasure the warrants. The liability classified warrants consist of the … Private Placement Warrants … [and] PIPE Warrants. The PIPE Warrants were entered into in congruence with the Business Combination, and include features similar to the Private Placement Warrants which require liability classification." In particular, the Company has now admitted that the

Private Place Warrants and the PIPE Warrants "require liability classification due to certain features that preclude equity classification pursuant to ASC 815, *Derivatives*…"

91. Additionally, ASC Topic 815 also requires that an entity recognizes derivative instruments, including certain derivative instruments embedded in other contracts, as assets or liabilities in the entity's statement of financial position and measure them at fair value.

92. A "derivative" is a financial instrument or contract with one or more underlyings and one or notional amounts or payment provisions. That is, a derivative derives its value from the fluctuation of a particular price or index or the occurrence of or nonoccurrence of an event.

93. ASC 815 applies to all entities and to all financial instruments and other contracts that meet the definition of a derivative in ASC 815-10-15-83 and do not qualify for one of the specified scope exceptions. It is important to note that the guidance in ASC 815-40 must be applied even if the instrument does not meet the definition of a derivative.

94. An "embedded derivative" includes implicit or explicit terms that affect some or all of the cash flows or the value of other exchanges required by the host contract in a manner similar to a derivative instrument. The "host contract" is the contract or instrument to which an embedded derivative is "added." Together, they are considered a hybrid instrument.

95. An embedded derivative must be separated from the host contract and accounted for as a derivative instrument pursuant to ASC 815-10 if the following criteria

are met: (a) the economic characteristics and risks of the embedded derivative are not clearly and closely related to the economic characteristics and risks of the host contract; (b) the hybrid instrument is not remeasured at fair value under otherwise applicable generally accepted accounting principles (GAAP) with changes in fair value reported in earnings as they occur; and (c) a separate instrument with the same terms as the embedded derivative would, pursuant to ASC 815-10-15, be a derivative instrument subject to the requirements of this Subtopic (the initial net investment for the hybrid instrument shall not be considered to be the initial net investment for the embedded derivative).

96. When considering whether an embedded equity-linked component is clearly and closely related to its host instrument, a reporting entity should first determine whether the "economic nature" of the host is an equity host or a debt host. An embedded equity-linked component is generally considered clearly and closely related to an equity host; it is not considered clearly and closely related to a debt host. To determine the nature of the host contract, the reporting entity should consider all stated and implied substantive terms and features of the hybrid instrument (inclusive of the embedded component). For example, a conversion feature in preferred stock deemed to be embedded in a debt host would not be clearly and closely related; therefore, it would be separated if the remaining criteria are met.

97. The fair value election within ASC 815 is applicable only to a hybrid financial instrument in which both the host contract and embedded derivative are financial instruments. Examples of financial instruments include loans, securities, debt,

foreign currency arrangements, and commodity contracts that require cash settlement. This irrevocable election to apply the fair value option and measure the entire hybrid financial instrument (including the embedded derivative) at fair value with changes in fair value recognized currently in earnings, except for the effect of changes in own credit, which are recognized in other comprehensive income, can only be made when the hybrid financial instrument is acquired or issued or when it is subject to a remeasurement (i.e., new basis) event.

98. Pursuant to ASC 815-10, if an issuer entity elects to prepay the forward contract at inception, the contract does not meet the definition of a freestanding derivative. That is, the initial net investment is equal to the amount that would be exchanged to acquire the asset related to the underlying. However, the entity must assess whether that nonderivative instrument contains an embedded derivative that requires separate accounting as a derivative unless a fair value election is made. For example, a prepaid forward contract is a hybrid instrument that is composed of a debt instrument as the host contract and an embedded derivative based on equity prices. The host contract is a debt instrument because the holder has none of the rights of a shareholder, such as the ability to vote the shares and receive distributions to shareholders. Unless the hybrid instrument is remeasured at fair value with changes in value recorded in earnings as they occur, the embedded derivative must be separated from the host contract because the economic characteristics and risks of a derivative based on equity prices are not clearly and closely related to a debt host contract, and a

separate instrument with the same terms as the embedded derivative would be a derivative subject to the requirements of ASC 815-10.

99. Despite these clear advisories, throughout the Class Period, SeaStar considered the Forward Purchase Agreements as nonderivative freestanding contracts and elected not to apply the fair value option to the entire financial instrument. In doing so, the Company failed to properly account for the embedded derivatives contained in the hybrid instrument. Accordingly, SeaStar violated a fundamental tenet of ASC 815 and made material misrepresentations of fact that forward option with the Forward Purchase Agreements "does not meet the definition of a derivative" and failed to properly account for the cash settlement obligation as a bifurcated derivative liability.

100. For example, the Company's FY22 10-K, provided, in pertinent part:

> **Critical Accounting Policies and Estimates**
>
> The preparation of the consolidated financial statements and related disclosures in conformity with U.S. GAAP requires management to make estimates, assumptions and judgments that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the consolidated financial statements, and income and expenses during the periods reported. Although actual results could materially differ from those estimates, such estimates are developed based on the best information available to management and management's best judgments at the time.
>
> Significant estimates include the valuation of the forward option on forward purchase agreement, derivative liability, warrants, and the amount of share-based compensation expense.
>
> *Forward Option on Forward Purchase Agreement*
>
> The forward option in the forward purchase agreements is remeasured each reporting period using a Monte-Carlo Simulation in a risk-neutral framework (a special case of the Income Approach). Specifically, the future stock price is simulated assuming a Geometric Brownian Motion

> ("GBM"). For each simulated path, the forward purchase value is calculated based on the contractual terms and then discounted at the term-matched risk-free rate. Finally, the value of the forward is calculated as the average present value over all simulated paths.
>
> ****
>
> During the year ended December 31, 2022, 3,995 recycled shares were sold by FPA Sellers. There were 1,147,405 recycled shares remaining at December 31, 2022.
>
> In accordance with ASC 815, Derivatives and Hedging, the Company has determined that the forward option within the Forward Purchase Agreements (i) is a freestanding financial instrument (ii) does not meet the definition of a derivative, (iii) is indexed to the Company's own stock, and (iv) does not meet the requirements for equity classification. The fair value of the option is recorded as an asset or a liability on the Consolidated Balance Sheets as forward option-prepaid forward contracts. The Company has performed fair value measurements for the forward option within the FPAs as of the Closing and as of December 31, 2022, which is described in Note 2. The Company remeasures the fair value of the forward option each reporting period.
>
> The initial value of the Forward option-prepaid forward contracts was $11,940[,000] at Closing. Recycled Shares with a value of $41[,000] were sold by the FPA Sellers. A loss on remeasurement of $10,170[,000] was recorded in Change in fair value of forward option on the consolidated statements of operations for the year ended December 31, 2022. On December 31, 2022, the value of the forward option within the FPAs was $1,729[,000] and recorded as Forward option-prepaid forward contracts on the consolidated balance sheets.

101. As detailed herein, SeaStar has now admitted that, despite repeated representations to the contrary during the Class Period, "[i]n accordance with ASC 815, *Derivatives and Hedging*, the Company had determined that the forward option within the Forward Purchase Agreement, coupled with certain settlement features were embedded features that required bifurcation and recognition as a liability."

### E. Defendants Mislead Investors as to the Strength, Viability, and Readiness of SeaStar's HDE Application and the Progress of its Regulatory Review

102. At all relevant times, SeaStar defined itself as a medical technology company focused primarily on developing and commercializing its lead product candidate, the Selective Cytopheretic Device (SCD), for pediatric and adult acute kidney injury (AKI) indications.

103. Through its developing platform therapy, the Company set out to reduce the consequences of hyperinflammation on vital organs. The inflammatory response is critical to fend off infections and repair damaged tissue in the body. In a normal inflammatory response, neutrophils (or white blood cells) are the first immune cells to arrive at the site and are key to the entire immune response that kills pathogens and promotes tissue repair. If the inflammatory response becomes excessive and dysregulated (referred as proinflammatory), normal neutrophil die off ("apoptosis") may be delayed, altering feedback mechanisms that regulate the immune system. This results in damaging hyperinflammation spreading uncontrollably to other parts of the body, often leading to acute chronic solid organ dysfunction or failure, including heart, lung, kidney and liver diseases. This hyperinflammatory response is also known as the "cytokine storm," referring to the body's reaction to the category of small-secreted proteins released by hyperinflammatory cells that affect communication between cells. The cytokine storm, when left uncontrolled, can lead to organ damage and even death.

104. Leading up to and throughout the Class Period, the Company claimed that, based on clinical and preclinical studies conducted over the last 15 years, SeaStar's technology has shown promise in modulating the degree of activity of proinflammatory cells to help reduce tissue damage and speed the repair and recovery of organ function.

105. SeaStar promoted the success of its technology as capable of transforming the ability of clinicians to treat acute organ failure in the intensive care unit ("ICU") and to improve chronic organ functions in hospitalized patients. When discussing the potential market for the Company's technology platform, SeaStar explained that few therapeutics are available to clinicians to address the issue of hyperinflammation and for those options that exist, such options are either immunosuppressive or only target one cytokine. SeaStar's technology was poised to have the potential to overcome limitations in existing anti-inflammatory treatments and address the challenge in selectivity targeting activated white blood cells.

106. The Company aimed to use its proprietary SCD technology platform to clinically validate several acute organ injury indications, including kidneys and lungs. SeaStar also sought to achieve regulatory approval and commercialization of its investigational SCD, an extracorporeal synthetic membrane device designed to be easily integrated into existing continuous kidney replacement therapy ("CKRT") systems that are commonly installed in hospitals, including in ICUs throughout the country. According to the Company, roughly 4,000 pediatric patients in the U.S. each year with AKI require CKRT and those patient profiles are associated with high morbidity and

mortality at approximately 50 percent. Children who survive an AKI episode are at risk of long-term conditions, including chronic kidney disease (CKD).

107. Premarket approval ("PMA") is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices. Class III devices are those that support or sustain human life, are of substantial importance in preventing impairment of human health, or which present a potential, unreasonable risk of illness or injury.

108. Due to the level of risk associated with Class III devices, the FDA has determined that general and special controls alone are insufficient to assure the safety and effectiveness of Class III devices. Therefore, these devices require a PMA application under Section 515 of the Federal Food, Drug, and Cosmetic Act (the "FD&C Act") in order to obtain marketing approval.

109. At all relevant times, SeaStar classified its leading product candidate, the SCD, as a Class III device, subject to PMA submission and approval.

110. Because the Center for Biologics, Evaluation, and Research ("CBER") has expertise in blood, blood products, and cellular therapies as well as the integral association of certain medical devices with these biological products, the FDA utilizes this expertise to review marketing and investigational device submissions (Premarket Notification, Premarket Approval, and Investigational Device Exemption ("IDE")) for medical devices associated with the blood collection and processing procedures as well as those associated with cellular therapies.

111. PMA is the most stringent type of device marketing application required by the FDA. The applicant must receive FDA approval of its PMA application prior to marketing the device. PMA approval is based on a determination by the FDA that the PMA contains sufficient valid scientific evidence to assure that the device is safe and effective for its intended use(s).

112. A PMA application is a scientific, regulatory documentation submitted to the FDA to demonstrate the safety and effectiveness of the Class III device. According to the FDA's website, there are administrative elements of a PMA application, but good science and scientific writing are key to the approval of PMA application. The FDA also explains that if a PMA application lacks elements listed in the administrative checklist, the FDA will refuse to file a PMA application and will not proceed with the in-depth review of scientific and clinical data. Additionally, if a PMA application lacks valid clinical information and scientific analysis on sound scientific reasoning, it could impact the FDA's review and approval.

113. The FDA instructs that PMA applications that are incomplete, inaccurate, inconsistent, omit critical information, and poorly organized have resulted in delays in approval or denial of those applications. Manufacturers should perform a quality control audit of a PMA application before sending it to the FDA to ensure that it is scientifically sound and presented in a well-organized format. The FDA provides numerous device-specific FDA guidance documents that describe data requirements for PMA applications. The agency also advises manufacturers to consult all applicable industry standards and recommendation practices.

114. One such applicable guidance includes the FDA's Humanitarian Device Exemption (HDE) Program: Guidance for Industry and Food and Drug Administration Staff, issued on September 6, 2019, and developed to provide clarity on the current review practices for the HDE Program under PMA (the "HDE Guidance").

115. The Human Device Exemption (HDE) provision was added to the FD&C Act by the Safe Medical Devices Act of 1990 and included, *inter alia*, a prohibition on profits from the sale of Human Use Devices ("HUD") and a requirement that before "use" of a HUD to treat or diagnose patients at a facility, an Institutional Review Board ("IRB") must approve such use. HUDs are medical devices intended to benefit patients in the treatment or diagnosis of diseases or conditions that affect or are manifested in not more than 8,000 individuals in the U.S. per year.

116. At all relevant times, SeaStar considered the SCD for pediatric use as a qualifying HUD eligible for HDE approval.

117. According to the FDA's HDE Guidance, before submitting an HDE application to the appropriate center (like CBER), the applicant must first prepare and submit a HUD designation request to the FDA's Office of Orphan Products Development ("OOPD") and receive a HUD designation. Each applicant must have its own HUD designation to submit an original HDE application for a proposed indication. Additionally, the HDE applicant can utilize the HDE pathway only if no other comparable device (other than another device approved under an HDE or under an approved IDE) is available to treat or diagnose the disease or condition.

118. A HUD that meets the HDE standard for approval is exempt from the requirement of establishing a reasonable assurance of effectiveness that would otherwise be required under Sections 514 and 515 of the FD&C Act. FDA approval of an HDE application authorizes an applicant to market a HUD in accordance with approved labeling and indication(s) for use, subject to certain profit and use restrictions set forth in Section 520(m) of the FD&C Act.

119. According to the FDA's HDE Guidance, the Agency's review of HDE applications has similarities to the review of traditional PMA applications, with a few key differences. Notably, one such key difference is that HDE applications accepted for filing and to which the applicant does not submit a major amendment are reviewed in *75 days*, rather than the traditional 180-day review timeframe for PMA applications. *See* 21 CFR 814.40 and 814.114.

120. Pursuant to 21 CFR 814.106, an HDE or HDE supplement may be amended or resubmitted upon an applicant's own initiative, or at the request of the FDA, for the same reasons and in the same manner as prescribed for PMAs in Section 814.37, except that the timeframes set forth in Section 814.37(c)(1) and (d) do not apply.

121. As prescribed for PMAs and applicable to HDEs, under 21 CFR 814.37(a), an applicant may amend a pending application or supplement to revise existing information or provide additional information. The FDA may request an amendment to provide any information regarding the device that is necessary for the FDA or the appropriate advisory committee to complete the review of the application or supplement

or with information concerning pediatric uses as required under Sections 814.20(b)(13) and 814.39(c)(2). *See* 21 CFR 814.37(b).

122. If the FDA requests an HDE applicant to submit an HDE amendment, and a written response to the FDA's request is not received within 75 days of the date of the request, the FDA will consider the pending HDE or HDE supplement to be withdrawn voluntarily by the applicant. *See* 21 CFR 814.106. Furthermore, if the HDE applicant, on its own initiative or at the FDA's request, submits a major amendment as described in Section 814.37(c)(1), the review period may be extended up to 75 days. *See id.* A major amendment includes an amendment that contains significant new data from a previously unreported study, significant updated data from a previously reported study, detailed new analyses of previously submitted data, or significant required information previously omitted. *See* 21 CFR 814.37(c)(1).

123. Once an applicant has submitted an HDE application, the FDA will notify the applicant of its decision to "File" or "Not File" for substantive review within 30 calendar days from the date the application was received.

124. After an original HDE application or HDE supplement is accepted for filing and the FDA begins its substantive review, the Agency may take the following action during its review: (1) Approval Order; (2) Approvable Letter; (3) Major Deficiency Letter; (4) Not Approvable Letter; and (5) Denial Order.

125. First, an Approval Order (or Letter) is considered a final action by the Agency and marks the end of the FDA's review. Upon the receipt of an Approval Order,

the applicant may begin commercial distribution of the device in accordance with any prescribed conditions of approval. *See* 21 CFR 814.116(b).

126. Second, an Approvable Letter is issued to inform the applicant that the FDA has completed its review of the HDE application and determined that one or both of the following are necessary:

- Resolution of minor deficiencies that are identified in the approvable letter. These deficiencies may include, for example, clarifications of previously submitted information, revisions to the labeling, and revisions to or development of a post-approval study protocol.
- Completion of an FDA inspection that finds the manufacturing facilities, methods, and controls in compliance with the Quality System Regulation, 21 CFR 820, and, if applicable, verifies records pertinent to the HDE application. When this is the case, the approvable letter states that the device is "approvable pending GMP inspection."

*See* 21 CFR 814.116(c).

127. According to the FDA's HDE Guidance, when the FDA issues an Approvable Letter pending the resolution of identified deficiencies or an GMP inspection letter, the Agency stops its review clock and places the application on hold. When the FDA receives an applicant's complete response to identified deficiencies in an Approvable Letter, the FDA considers this to be a major amendment and restarts the review clock with a new 75-day FDA response timeframe. Conversely, once the FDA determines that the GMP issues are resolved, the Agency will issue an Approval Letter if all other minor deficiencies that may have been noted in the Approvable Letter have also been resolved.

128. Third, a Major Deficiency Letter is issued to inform the applicant that the HDE application lacks significant information necessary for the FDA to complete its

review and requests that the applicant amend to provide the necessary information regarding the device. *See* 21 CFR 814.106 and 814.37(b). Such necessary amendments identified in a Major Deficiency Letter include, *inter alia*, additional clinical experience and/or non-clinical data to demonstrate probable benefit and/or that the device will not expose patients to an unreasonable or significant risk of illness or injury; scientific rationale for test data provided in the application; or a re-analysis of previously submitted data (e.g., alternative analytical method).

129. According to the FDA's HDE Guidance, when the FDA issues a Major Deficiency Letter, the Agency stops the FDA review clock and places the application on hold. When the FDA receives a complete response to a Major Deficiency Letter, the Agency considers it a major amendment and restarts the clock with a new 75-day FDA response timeframe.

130. Fourth, a Not Approvable Letter is issued to inform the applicant that the FDA has completed its review, and that the Agency does not believe that the application can be approved 'as-is' because of significant deficiencies. The Not Approvable Letter will describe the deficiencies in the HDE application, including each applicable ground for not approving and, where practical, will identify measures required to place the application in an approvable form. *See* 21 CFR 814.116(d).

131. According to the FDA's HDE Guidance, before issuing a Not Approvable Letter, in general, the Agency will *first* issue a Major Deficiency Letter to provide the applicant with an opportunity to address its concerns. However, if an applicant fails to provide an adequate response to a Major Deficiency Letter, or if the FDA has attempted

to resolve all deficiencies via interactive review and has not received adequate responses, the Agency will issue a Not Approvable Letter.

132. When the FDA issues a Not Approvable Letter, the Agency stops its review clock and places the application on hold. If the FDA receives a complete response to a Not Approvable Letter, the amendment will be considered a major amendment, and the Agency will restart the clock with a new 75-day FDA response timeframe. *See* 21 CFR 814.44(f)(1) and 814.116(d).

133. Lastly, the FDA may deny approval of an HDE application for any of the identified in 21 CFR 814.118(a). The Denial Order will identify all deficiencies in the application, including each applicable ground for denial and, where practical, will identify measures required to place the application in an approvable form.

134. On July 20, 2022, SeaStar announced that it had submitted an HDE application to the FDA for use of the SCD for critically-ill children with AKI (the "HDE Application"). The press release went on providing that the FDA had informed the Company that the Agency had accepted the HDE application for filing and will begin its review.

135. Defendant Schlorff is quoted in the July 20, 2022 press release as saying, "[t]he FDA's acceptance of the HDE application represents an important step forward in helping pediatric specialists care for these critically-ill children[.] … We believe use of the SCD holds tremendous promise for these patients and look forward to working closely with the FDA in the review of our application."

136. Throughout the Class Period, Defendants made materially false and/or misleading statements concerning the strength and readiness of the Company's HDE Application and based on adverse information known at the time, materially misrepresented SeaStar's regulatory prospects and timeline for achieving final marketing approval.

137. According to the FDA's Approval Order relating to the Company's HDE Application, issued on February 21, 2024 (the "February 2024 Approval Order"), contrary to Defendants' Class Period statements, SeaStar submitted the HDE Application on July 1, 2022. And according to an FDA database, the Agency accepted the Company's HDE Application for review on July 13, 2022. Accordingly, based on the acceptance date of July 13, 2022, the 75-day FDA review timeframe—free of any hold periods or the reset of the FDA's review clock following any major amendments—would have ended on September 26, 2022.

138. However, unbeknownst to investors, SeaStar's HDE Application was subject to multiple hold periods as evident by the lengthy amendment history included in the February 2024 Approval Order, showing amendments filed on: August 11, 2022; August 12, 2022, August 19, 2022; August 29, 2022; September 19, 2022; September 20, 2022; September 27, 2022; September 27, 2022; September 30, 2022; October 7, 2022; October 11, 2022; October 13, 2022; December 19, 2022; February 21, 2023; March 2, 2023; April 3, 2023; April 11, 2023; May 15, 2023; June 9, 2023; September 26, 2023; October 17, 2023; October 25, 2023; December 8, 2023; December 22, 2023;

January 24, 2024; January 26, 2024; January 31, 2024; February 9, 2024; February 13, 2024; February 15, 2024; February 20, 2024 and February 21, 2024.

139. Furthermore, the Federal Regulation's explicit resetting of the FDA's 75-day review clock following the Company's receipt of a Not Approvable Letter and the subsequent Approvable Letter, further undermined the reasonableness of Defendants' touted timeline for expected regulatory approval and commercialization of the SCD for pediatric use.

140. The Class Period begins on October 31, 2022, when SeaStar issued a press release announcing the consummation of the Business Combination and outlining the Company's corporate strategy and near-term catalysts. In pertinent part, the press release touted that:

> Based on positive findings from SeaStar Medical's Pilot Study (NCT02820350) of pediatric patients with AKI which demonstrated that the SCD was safe for use in pediatric patients, the Company filed for Humanitarian Device Exemption (HDE) with the U.S. Food and Drug Administration (FDA) for use of the SCD for critically ill children over 20kg with AKI.

141. The press release went on to highlight the Company's "*Upcoming Expected Value-Driving Milestones*" listing "Q1 2023: FDA approval under HDE" and "Q2 2023: Commercial launch of SCD for pediatric AKI" (emphasis in original).

142. Over the next several months, Defendants continued offering assurances of the Company's touted timeline for expected FDA approval and commercial launch of SCD for pediatric AKI. For example, on December 2, 2022, when discussing the Company's business objectives and regulatory prospects, Defendant Schlorff claimed

"SeaStar Medical has continued to evolve and ***remains on a trajectory of growth including near-term potential for commercialization***" (emphasis added).

143. Likewise, on January 9, 2023, in a press release announcing the Company's submission of an IDE application to the FDA requesting approval to initiate a pivotal study to evaluate the effectiveness of the SCD in reducing hyperinflammation in adults with AKI, Defendant Schlorff is quoted as saying, "We are pleased to take this important step in our journey towards creating the new standard of care in reducing harmful hyperinflammation. ***The FDA has demonstrated continued support in the SCD in granting*** breakthrough therapy status in adults and ***a substantive review of a Humanitarian Device Exemption (HDE) for pediatric AKI patients***" (emphasis added).

144. Then, on March 30, 2023, the Company filed an annual report for the fiscal year ended December 31, 2022, on Form 10-K with the SEC (the "FY22 10-K"). In pertinent part, the FY22 10-K asserted that the Company submitted the HDE Application "***[i]n June 2022***" and "***[b]ased on the current timeline for the HDE application, we expect the FDA to complete its substantive review of our HDE application during the first half of 2023***" (emphasis added).

145. In addition, despite the FDA's clear advisories providing a shortened review period for HDE applications (*i.e.* 75 days), the FY22 10-K supported Defendants' touted timeline providing the Company's "Pre-market Approval Pathway" as follows:

> A pre-market approval application must be submitted to the FDA for Class III devices for which the FDA has required a PMA. The pre-market approval application process is more extensive than the 510(k) pre-market notification and de novo request processes. A PMA application must be

supported by extensive data, including but not limited to technical, preclinical, clinical trials, manufacturing and labeling to demonstrate to the FDA's satisfaction reasonable evidence of safety and effectiveness of the device.

After a pre-market approval application is submitted, the FDA has 45 days to determine whether the application is sufficiently complete to permit a substantive review and thus whether the FDA will file the application for review. The FDA has 180 days of FDA review time to review a filed pre-market approval application, although the review of an application generally occurs over a significantly longer period of time due to hold periods during which the submitting sponsor (the company) gathers information to address FDA requests for additional information. The total review process is highly variable and can take up to several years. During this review period, the FDA may request additional information or clarification of the information already provided. Also, an advisory panel of experts from outside the FDA may be convened to review and evaluate the application and provide recommendations to the FDA as to the approvability of the device.

Although the FDA is not bound by the advisory panel decision, the panel's recommendations are important to the FDA's overall decision-making process. In addition, the FDA generally conducts a pre-approval inspection of the manufacturing facilities to ensure compliance with the Quality System Regulation ("QSR"). The agency also may inspect one or more clinical sites to assure compliance with FDA's regulations.

Upon completion of the PMA review, the FDA may: (i) approve the PMA that authorizes commercial marketing with specific prescribing information for one or more indications, which can be more limited than those originally sought; (ii) issue an approvable letter that indicates the FDA's belief that the PMA is approvable and states what additional information the FDA requires, or the post-approval commitments that must be agreed to prior to approval; (iii) issue a not approvable letter that outlines steps required for approval, but which are typically more onerous than those in an approvable letter, and may require additional clinical trials that are often expensive and time consuming and can delay approval for months or even years; or (iv) deny the application. If the FDA issues an approvable or not approvable letter, the applicant has 180 days to respond, after which the FDA's review clock is reset.

146. Based on the information later revealed in the FDA's February 2024 Approval Order, SeaStar did not submit the HDE Application until July 2022 and based

on the concealed amendment history coupled with applicable federal regulations, the Company's regulatory review was already significantly delayed and the HDE Application was at material risk of being considered not approvable in its current form.

## F. The Truth About SeaStar's Deficient HDE Application Begins to Leak Out

147. Then, on May 9, 2023, the truth about SeaStar's deficient HDE Application began to leak out. During post-market hours, SeaStar issued a press release entitled, "SeaStar Medical Provides Regulatory Update Related to its HDE Application for Pediatric Selective Cytopheretic Device" (the "May 2023 Disclosure"), filed as Exhibit 99.1 to a current report filed with the SEC on Form 8-K, signed by Defendant Schlorff.

148. The Company's May 2023 Disclosure revealed its receipt of a Not Approvable Letter issued by the FDA concerning the HDE Application, stating, in relevant part:

> [I]t has received a letter from the Center for Biologics Evaluation and Research (CBER) of the U.S. Food and Drug Administration (FDA) regarding the Company's Humanitarian Device Exemption (HDE) application for its pediatric Selective Cytopheretic Device (SCD), which is designed to treat critically ill children with acute kidney injury (AKI) on continuous kidney replacement therapy (CKRT). In the letter, ***the FDA indicated that the application is not approvable in its current form*** but outlined specific guidance as to how the application may be amended and resubmitted successfully.

(Emphasis added).

149. On this news, the price of SeaStar securities fell from a closing price of $1.94 per share on May 9, 2023 to a closing price of $1.17 per share on May 10, 2023, representing a nearly 40% decline in a single trading day.[3]

150. Nevertheless, Defendants continued to mislead investors regarding the strength and readiness of the HDE Application and the Company's ability to adequately respond to the FDA's requests for information necessary to achieve approval. Indeed, as detailed above, the Company would ultimately submit an additional fifteen (15) amendments to the HDE application between the time of this announcement and its receipt of the February 2024 Approval Order.

151. Defendant Schlorff is quoted in the May 2023 Disclosure as stating, "We are disappointed by the FDA's decision not to approve our HDE application at this time. After a series of collaborative meetings and correspondence over the past 10 months, and repeatedly being responsive to the Agency's recommendations, this determination is surprising."

152. Schlorff went on to assert that, "We believe that each of the current deficiencies cited by the Agency in their letter are readily addressable. However, we intend to initially request FDA's administrative review and submit an appeal if needed. In parallel, we plan to implement other mitigations, where appropriate, and continue working with CBER with the goal of achieving pediatric HDE approval."

[3] The historical closing stock prices and their attendant declines in value, as referenced herein, reflect the value of SeaStar's stock prior to a 1-for-25 stock split that took place on June 10, 2024, after the Class Period ended.

153. Following the May 2023 Disclosure, Defendants waisted little time to set yet another unreasonable timeline for the Company's expected FDA approval. On May 15, 2023, SeaStar issued a press release reporting its first quarter 2023 financial results and providing a business update. In pertinent part, the press release quoted Defendant Schlorff as saying, "[f]ollowing the recent receipt of a non-approvable letter, we are working with the FDA to secure a Humanitarian Device Exemption (HDE) for use of the SCD to treat critically ill children with AKI, and ***we are now targeting approval in later 2023***" (emphasis added).

154. On August 14, 2023, the Company reported its second quarter of 2023 financial results and provided a business update. When discussing SeaStar's regulatory prospects for the SCD for pediatric use, the press release assured investors that "[t]he Company continues to work diligently with FDA toward a resolution of this review process." Defendant Schlorff is also quoted as saying:

> Most pharmaceutical development programs begin in adult populations with plans for pediatric studies once safety and efficacy have been established. We elected to lead with the Humanitarian Device Exemption (HDE) regulatory pathway for the pediatric population based on the highly promising data from our SCD-PED study showing a 50% reduction in mortality and no dialysis required at Day 60[.] … Despite a challenging pediatric approval pathway, we are working collaboratively with the FDA. To our knowledge the SCD-PED would be among the first ***pediatric*** medical devices to be approved by the FDA's Center for Biologics Evaluation and Research (CBER) through the HDE pathway, presenting a unique regulatory review situation. We believe the FDA has appropriately set a very high bar in its evaluation of the SCD-PED given the vulnerability of these critically ill children in the ICU. That said, we are confident that the SCD-PED device will meet or even exceed the high standards set by the FDA.

(Emphasis in original).

155. Then, on October 3, 2023, the Company issued a press release announcing its receipt of a "correspondence" from the FDA's CBER "indicating that ***the Agency considers the Selective Cytopheretic Device (SCD) Pediatric (SCD-PED) to be approvable under a Humanitarian Device Exemption (HDE)*** for use in children weighing 10 kilograms or more with acute kidney injury (AKI) and sepsis or a septic condition requiring continuous kidney replacement therapy (CKRT) in the hospital intensive care unit (ICU)" (emphasis added).

156. The press release went on to announce that this CBER correspondence indicated that an Approvable Letter "is expected to be issued within a month," however, the Company downplayed the significance of receiving an Approvable Letter claiming that it is "a standard part of CBER's approval process" and describing the contents such that, "[t]he Approvable Letter will outline conditions, including language for safety, probable benefit and labeling for intended use, which will be required for formal marketing approval."

157. Defendant Schlorff is quoted in the press release as stating, in relevant part:

> ***The correspondence provides a clear path forward in making this much needed therapy accessible to critically ill children suffering with AKI and sepsis***[.] … We understand the agency's appropriate caution in these medically fragile septic patients whose care requires significant resources, and we appreciate the agency's willingness to work collaboratively with SeaStar Medical and our advisors to review the HDE application, as well as its recognition of SCD as a therapy with probable benefit for these children***. This is an important milestone for SeaStar Medical, and we intend to follow the regulatory path laid out by the FDA to commercialize SCD for this indication by the end of 2023***.

(Emphasis added).

158. Finally, on October 30, 2023, SeaStar issued a press release entitled, "FDA Issues Approvable Letter for SeaStar Medical's Selective Cytopheretic Device for Pediatric Patients," which announced that the FDA's CBER had issued an Approvable Letter (the "October 2023 Disclosure"). Defendants continued to try and downplay the significance of receiving an Approvable Letter claiming, "[t]he issuance by the FDA of an Approvable Letter is a standard step in the approval process of a Humanitarian Device Exemption (HDE) application." However, contrary to the Company's October 3, 2023 press release, the details of the Approvable Letter revealed on October 30, 2023 no longer afforded Defendants with the opportunity to falsely present this as purely positive event.

159. Indeed, the October 2023 Disclosure revealed that, while the FDA's Approvable Letter indicates that "SeaStar Medical's HDE application substantially meets the requirements for an Approval Order" it also "outlines remaining administrative steps that must be finalized before the HDE can be active for commercialization." In particular, before the HDE Application could be approved, the FDA indicated that SeaStar must "include revisions to product labeling and minor modifications to the post-approval study plan." Based on the Company's receipt of the Approvable Letter, identifying multiple deficiencies, SeaStar intended to "work diligently with the FDA to complete these action items in the coming weeks" and now "expects to commence commercialization of the SCD by the end of 2023 or 1Q24."

160. On this news, the price of SeaStar securities dropped from a closing price of $1.02 per share on October 27, 2023 (the preceding trading day) to $0.82 per share at close on October 31, 2023, representing a nearly 20% decline.

**G. The Company Reveals the Restatement of its Prior Financial Reports**

161. Despite the precipitous decline in the price of SeaStar securities following the Company's disclosure of adverse information concerning its regulatory approval process, SeaStar securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the true scope and severity of deficiencies in the Company's financial controls and procedures.

162. Then, on March 27, 2024, during pre-market hours, SeaStar issued a press release entitled, "SeaStar Medical to Restate Financials, Sets Business Update Call for April 17" (the "March 2024 Press Release"), announcing that it would restate its financial statements (the "Restatement") for the for the fiscal year ended December 31, 2022 and for the interim periods ended March 31, 2023, June 30, 2023 and September 30, 2023 (the "Affected Periods").

163. Specifically, the March 2024 Press Release revealed that the Restatement would "impact the accounting treatment and classification of certain warrants and the prepaid forward purchase arrangement that was terminated in June 2023" (*i.e.*, the Forward Purchase Agreements). Defendant Schlorff attempted to downplay the significance of the Restatement claiming, "[t]he restatement is not expected to have a

material impact on our business operation or our cash position, but rather is related to the reporting of non-cash accounting items."

164. Also on March 27, 2024, during pre-market hours, SeaStar filed a current report on Form 8-K with the SEC (the "March 2024 Current Report"), providing the following additional details regarding the Restatement:

> On March 21, 2024, after discussion with the Company's management, the Audit Committee determined that a restatement of the Company's audited financial statements for the fiscal year ended December 31, 2022 and unaudited interim financial statements for the fiscal quarters ended March 31, 2023, June 30, 2023 and September 30, 2023 would be appropriate in order to restate the accounting treatment of the following instruments:
>
> 1. *Classification of Warrants* — Private placement and PIPE warrants (the "**Liability Classified Warrants**") were originally classified as components of stockholders' equity, however, there were certain features that precluded equity classification in accordance with ASC 815-40 – Derivatives and Hedging - Contracts in Entity's Own Equity and resulted in the warrants being liability classified. The Liability Classified Warrants are required to be remeasured at each reporting period date, and the changes in fair value recognized as a component of earnings.
>
> 2. *Prepaid Forward Purchase Agreements* — The prepaid forward purchase agreements were originally accounted for as net assets of the Company, with changes in fair value recognized through earnings. However, after further analysis, the prepaid forward purchase agreements should have been accounted for as hybrid instruments constituting a combination of (i) a subscription receivable on the Company's own common stock and (ii) an embedded derivative liability in the form of a future settlement at maturity of $2.50 per share of the Company's common stock not sold off to investors. The prepayment amount is required to be classified in the equity section of the Company's consolidated balance sheet and the derivative liability is required to be remeasured at each reporting period date, and the changes in fair value recognized as a component of earnings.

> The Company's Chief Financial Officer and Audit Committee discussed the matters disclosed herein with WithumSmith+Brown, PC, ("WSB") who was appointed as the Company's independent registered public accounting firm on November 28, 2023, as well as Armanino LLP, the Company's independent registered accounting firm prior to the WSB appointment.
>
> The Company intends to include the (i) original and (ii) the amended and restated (including the necessary reconciling bridges): (a) Consolidated Balance Sheets, (b) Consolidated Statements of Operations, (c) Consolidated Statements of Changes in Stockholders' Deficit and (d) Consolidated Statements of Cash Flows necessary to provide the relevant understanding of those financial statement captions restated for the following periods: (1) As of and the year-ended December 31, 2022, (2) three-months ended March 31, 2023, (3) three-and six-months ended June 30, 2023, and (4) three-and nine-months ended September 30, 2023. The proposed restatement described above impacts non-cash items in the Company's financial statements.
>
> In addition, the Company expects to disclose in its Form 10-K a material weakness in its design and operation of effective internal controls over financial reporting in connection with the aforementioned restatement. The Company will provide further information on the material weakness and its plan for remediation in its Form 10-K.

165. On this news, the price of SeaStar securities fell approximately $0.04 per share, or 4.84%, to close at approximately $0.71 per share on March 27, 2024.

166. On April 16, 2024, during after-market hours, SeaStar filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and fiscal year ended December 31, 2023 (the "FY23 10-K").

167. Under "Note 2. Summary of Significant Accounting Policies," the FY23 10-K provided, in pertinent part:

> ***Basis of presentation***. The Company's consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ('U.S. GAAP') and the rules and regulations of the Securities and Exchange Commission ('SEC').

In connection with the preparation of the 2023 annual consolidated financial statements, the Company identified errors in its previously issued financial statements.

In accordance with SEC Staff Accounting Bulletin ('SAB') No. 99, *Materiality*, and SAB No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*, the Company assessed the materiality of these errors to its previously issued consolidated financial statements. Based upon the Company's evaluation of both quantitative and qualitative factors, the Company concluded the errors were material to the Company's previously issued consolidated financial statements. Accordingly, the Company has restated its previously issued consolidated financial statements as shown in Note 3, Restatement of Previously Issued Consolidated Financial Statements and Note 19, Restatement of Quarterly Unaudited Results. All relevant footnotes have also been adjusted to reflect the impact of the restatements.

****

***Fair value of financial instruments***

The following provides a summary of those assets or liabilities for which the Company is required to measure at fair value either on a recurring basis, the valuation techniques and summary of inputs used to arrive at the measure of fair value. Changes in fair value of these assets or liabilities are recognized as a component of net income in the consolidated statement of operations. Changes in fair value of these assets or liabilities are considered unrealized gains or losses and therefore are classified as non-cash adjustments to reconcile net income to operating cash flows. Significant increases (decreases) in unobservable inputs used in fair value measurements could, in isolation, potentially result in a significantly lower or higher valuation for those assets or liabilities requiring recurring fair value measurements at each reporting date.

*Forward Purchase Agreement Derivative Liability.* The prepaid forward purchase agreement derivative liability (the 'FPA Derivative Liability') is required to be recognized as a liability as the financial instrument fails the '*Indexation Guidance'* of ASC 815-10 in addition to having certain settlement features that could or will require settlement in cash or shares, depending on the feature. The FPA Derivative Liability was initially recorded at $5.2 million on October 28, 2022 (see Note 5). The FPA Derivative Liability was remeasured each reporting period using a Monte-Carlo Simulation in a risk-neutral framework (a special case of the Income Approach). Specifically, the future stock price is simulated assuming a

> Geometric Brownian Motion ('GBM'). For each simulated path, the forward purchase value was calculated based on the contractual terms and then discounted at the term-matched risk-free rate. Finally, the value of the forward was calculated as the average present value over all simulated paths. Changes in the fair value of the FPA Derivative Liability are recorded each reporting period to the change in the fair value of the forward purchase agreement derivative liability in the consolidated statement of operations.
>
> ****
>
> *Liability Classified Warrants.* During the fiscal year ended December 31, 2023 and 2022, the Company has entered into or assumed as part of the Business Combination various financial instruments, in the form of warrant agreements, that require classification as liabilities. This classification requires that the Company measure the warrants at fair value at inception, and the remeasure the warrants. The liability classified warrants consist of the following (see Note 11 for more information):
>
> Private Placement Warrants. The Company assumed 5,738,000 Private Placement warrants as part of the Business Combination.
>
> PIPE Warrants. The PIPE Warrants were entered into in congruence with the Business Combination, and include features similar to the Private Placement Warrants which require liability classification.
>
> Investor D Warrants. During the fiscal year ended December 31, 2023, the Company entered into various convertible credit agreements with an institutional investor ('Investor D') which included detachable and separately exercisable warrants to purchase shares of the Company's common stock (the 'Investor D Convertible Note Warrants').
>
> The Company uses a Black-Scholes option pricing model to fair value Warrants, using standard option pricing inputs such as the strike price of each warrant tranche, estimated volatility, time to maturity, and the risk-free interest rate. The risk-free interest rate is the U.S. Treasury rate at the date of issuance, and the time to maturity is based on the contractual life at the date of issuance, which is five years. The change in fair value of the liability classified warrants each reporting period is recorded to the change in fair value of warrants liability in the consolidated statement of operations.

168. Among other financial results, the FY23 10-K reported SeaStar's amended and restated financial statements for the Affected Periods, including, *inter alia*, total

assets that declined from approximately $4.77 million to approximately $3.04 million, as well as total liabilities that increased from approximately $13 million to $23.8 million, for the year ended December 31, 2022; total liabilities that increased from $14.27 million to approximately $27.02 million for the quarter ended March 31, 2023; total liabilities that increased from approximately $13.78 million to approximately $14.35 million for the quarter ended June 30, 2023; and total liabilities that increased from $18.15 million to approximately $18.53 million for the quarter ended September 30, 2023.

169. In addition, the FY23 10-K revealed that net total other expenses had increased from $681,000 to approximately $2.52 million, while net losses had increased from approximately $5.3 million to approximately $7.1 million, for the three months ended March 31, 2023; that net total other expenses had increased from $595,000 to approximately $1.21 million, while net losses had increased from approximately $8.93 million to approximately $9.54 million, for the six months ended June 30, 2023; and that net total other expenses had increased from approximately $5.09 million to approximately $5.5 million, while net losses had increased from approximately $16.36 million to approximately $16.78 million, for the nine months ended September 30, 2023.

170. Subsequently, during after-market hours, on April 17, 2024, SeaStar issued a press release announcing the Company's 2023 financial results and providing a business update (the "April 2024 Press Release") which included, in pertinent part, the filing of its restated financial statements for the Affected Periods. The Company's FY23 10-K and April 17, 2024 Press Release revealed that the Restatement had an expanded impact on SeaStar's financial reporting beyond was previously disclosed in the March

2024 Press Release and Current Report. Indeed, the April 2024 Press Release quoted Defendant Schlorff as stating, in relevant part, that "[t]he restatement primarily involved the accounting treatment of non-cash items and had minimal to no impact on our operating expenses, cash usage, cash position, or future business potential."

171. On this news, the price of SeaStar securities declined from a closing price of $0.71 per share on April 16, 2024 to closing price of $0.54 per share on April 18, 2024, representing a nearly 24% decline.

172. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

173. Throughout the Class Period, Defendants made materially false and misleading statements and/or failed to disclose material adverse facts about SeaStar's business, operations, and prospects. When the truth underlying each of the false and misleading statements set forth below was revealed to the market, the price of SeaStar securities plummeted.

174. The Class Period begins on October 31, 2022, when SeaStar issued a press release announcing that the newly combined company had commenced trading on the NASDAQ and outlining SeaStar's corporate strategy and near-term catalysts. In pertinent part, the Company touted its submission of the HDE Application and its regulatory prospects, stating:

> Roughly 4,000 pediatric patients in the U.S. each year with AKI require CKRT and those patient profiles are associated with high morbidity and

> mortality. The mortality rate in children with AKI requiring CKRT is approximately 50 percent. Children who survive an AKI episode are at risk of long-term conditions, including chronic kidney disease (CKD).
>
> Based on positive findings from SeaStar Medical's Pilot Study (NCT02820350) of pediatric patients with AKI which demonstrated that the SCD was safe for use in pediatric patients, the Company filed for [HDE] with the [FDA] for use of the SCD for critically ill children over 20 kg with AKI.
>
> *Upcoming Expected Value-Driving Milestones*
>
> - ***Q1 2023: FDA approval under HDE***
> - ***Q2 2023: Commercial launch of SCD for pediatric AKI***
>
> (Emphasis added).

175. The press release also quoted Defendant Schlorff, who likewise touted the HDE Application submission, as well as SeaStar's business and financial prospects, stating:

> SeaStar Medical has continued to deliver on its promises with operational excellence. I am incredibly pleased with the progress made and proud of the team that has put in a tremendous amount of effort to get the Company to where we are today … As a publicly listed company, we gain valuable access to the capital markets which I believe will help build momentum and propel the Company to the next level of growth. In addition to the progress we've made on the corporate front, we continue to advance our innovative SCD therapy platform. ***We have a number of value-driving anticipated milestones, including our potential near-term evolution to a commercial stage company driven by potential FDA approval in our lead program, pediatric AKI*** … I am excited for what is to come and look forward to providing updates as we execute on the milestones ahead.
>
> (Emphasis added).

176. The statements identified above are materially false and/or misleading because (i) SeaStar had deficient compliance controls and procedures related to the HDE Application resulting in the need for multiple amendments to provide the necessary

information regarding the device for the FDA to complete its review; and (ii) because there were deficiencies with the HDE Application, the FDA was unlikely to approve the HDE Application in its present form, and the SCD's regulatory prospects were overstated.

177. On November 3, 2022, SeaStar issued a press release "announc[ing] positive interim data" from an ongoing study evaluating the SCD in children. That press release stated that "[t]he SCD is currently being evaluated by the FDA for [HDE] marketing approval for use in children (>20 kgs) with AKI" and "[t]he ***Company expects the FDA to complete a substantive review of its HDE application during the first quarter of 2023, with a potential commercial launch expected in the second quarter of 2023***" (emphasis added).

178. The statements identified above are materially false and/or misleading because (i) SeaStar had deficient compliance controls and procedures related to the HDE Application resulting in the need for multiple amendments to provide the necessary information regarding the device for the FDA to complete its review; and (ii) because there were deficiencies with the HDE Application, the FDA was unlikely to approve the HDE Application in its present form, and the SCD's regulatory prospects were overstated.

179. On November 7, 2022, the Company issued a press release entitled, "SeaStar Medical's Lead Product Candidate, the Selective Cytopheretic Device (SCD), Included in Consensus Statement for Pediatric Acute Kidney Injury in First Pediatric Acute Disease Quality Initiative (ADQI) Meeting" stating, in pertinent part, that:

- ***The Company expects the FDA to complete a substantive review of its HDE application during the first quarter of 2023***

****

> The SCD is currently being evaluated by the FDA for a Humanitarian Device Exemption (HDE) marketing approval for use in children (>20 kgs) with AKI. ***The Company expects the FDA to complete a substantive review of its HDE application during the first quarter of 2023, with a potential commercial launch expected in the second quarter of 2023***.

(Emphasis added).

180. The press release also quoted Defendant Schlorff as stating, in relevant part, "***[h]aving submitted our Humanitarian Device Exemption application with the U.S. FDA in June of this year, we are planning towards a potential approval of the SCD for use in critically ill children with AKI in the first quarter of 2023***" (emphasis added).

181. The statements identified above are materially false and/or misleading because (i) SeaStar did not submit the HDE Application until July 1, 2022; (ii) SeaStar had deficient compliance controls and procedures related to the HDE Application resulting in the need for multiple amendments to provide the necessary information regarding the device for the FDA to complete its review; and (iii) because there were deficiencies with the HDE Application, the FDA was unlikely to approve the HDE Application in its present form, and the SCD's regulatory prospects were overstated.

182. On December 2, 2022, the Company issued a press release announcing the appointment of Thomas R. Mullen as Vice President of Operations and Product Development, providing, in relevant part, that:

> As VP, Operations and Product Development, Mr. Mullen will oversee the development and advancement of the Company's Selective Cytopheretic Device (SCD), a patented cell-directed extracorporeal therapy that works with continuous kidney replacement therapy (CKRT) systems to selectively target and reduce the inflammatory effects of activated neutrophils while transitioning pro-inflammatory monocytes to promote reparative processes. The SCD is currently being evaluated by the FDA for a Humanitarian Device Exemption (HDE) marketing approval for use in children (>20 kgs) with acute kidney injury (AKI). ***The Company expects the FDA to complete a substantive review of its HDE application during the first quarter of 2023, with a potential commercial launch expected in the second quarter of 2023***.
>
> (Emphasis added).

183. The press release also quoted Defendant Schlorff as stating, in relevant part, "SeaStar Medical has continued to evolve and ***remains on a trajectory of growth including near-term potential for commercialization.*** As we continue our preparations for success in treating both acute and chronic illnesses through advanced product offerings, we believe Tom's extensive experience and expertise will be invaluable" (emphasis added).

184. The statements identified above are materially false and/or misleading because (i) SeaStar had deficient compliance controls and procedures related to the HDE Application resulting in the need for multiple amendments to provide the necessary information regarding the device for the FDA to complete its review; and (ii) because there were deficiencies with the HDE Application, the FDA was unlikely to approve the HDE Application in its present form, and the SCD's regulatory prospects were overstated.

185. On December 29, 2022, SeaStar issued a press release entitled, "SeaStar Medical and Nuwellis Enter into a U.S. License and Distribution Agreement for SeaStar

Medical's Selective Cytopheretic Device (SCD) for Pediatric Acute Kidney Injury (AKI)," filed as Exhibit 99.1 to a current report filed with the SEC on Form 8-K, signed by Defendant Schlorff. In pertinent part, the press release announced "an exclusive U.S. license and distribution agreement by Nuwellis of SeaStar Medical's Selective Cytopheretic Device (SCD) for the treatment of acute kidney injury (AKI) in children. … ***SeaStar Medical expects the U.S. Food and Drug Administration (FDA) to complete a substantive review of a Humanitarian Device Exemption (HDE) for the use of SCD in children (>20 kg.) with AKI during the first quarter of 2023, with a potential commercial introduction in the second quarter of 2023***" (emphasis added).

186. The statements identified above are materially false and/or misleading because (i) SeaStar had deficient compliance controls and procedures related to the HDE Application resulting in the need for multiple amendments to provide the necessary information regarding the device for the FDA to complete its review; and (ii) because there were deficiencies with the HDE Application, the FDA was unlikely to approve the HDE Application in its present form, and the SCD's regulatory prospects were overstated.

187. On January 9, 2023, the Company issued a press release entitled, "SeaStar Medical Submits Investigational Device Exemption (IDE) Application to FDA to Study a Novel Therapy to Reduce Hyperinflammation in Adult Acute Kidney Injury Patients," filed as Exhibit 99.1 to a current report filed with the SEC on Form 8-K, signed by Defendant Schlorff. In pertinent part, the press release stated that:

> In July 2022, SeaStar Medical announced it has submitted its application to the FDA for Humanitarian Device Exemption (HDE) for use of the Selective Cytopheretic Device (SCD) for critically ill children with AKI. The HDE application submission to the FDA was based on findings from SeaStar Medical's Pilot Study (NCT02820350) of pediatric patients with AKI which demonstrated that the SCD was safe for use in pediatric patients. ***The Company expects the FDA to complete its substantiative review of the HDE in the first quarter of 2023, with a commercial launch in the second quarter of 2023***.
>
> (Emphasis added).

188. The press release also quoted Defendant Schlorff as stating, in relevant part, that: "We are pleased to take this important step in our journey towards creating the new standard of care in reducing harmful hyperinflammation. ***The FDA has demonstrated continued support in the SCD in*** granting breakthrough therapy status in adults and ***a substantive review of a Humanitarian Device Exemption (HDE) for pediatric AKI patients***" (emphasis added).

189. The statements identified above are materially false and/or misleading because (i) SeaStar had deficient compliance controls and procedures related to the HDE Application resulting in the need for multiple amendments to provide the necessary information regarding the device for the FDA to complete its review; and (ii) because there were deficiencies with the HDE Application, the FDA was unlikely to approve the HDE Application in its present form, and the SCD's regulatory prospects were overstated.

190. On March 30, 2023, SeaStar issued a press release announcing its 2022 financial results and providing a business update, filed as Exhibit 99.1 to a current

report filed with the SEC on Form 8-K, signed by Defendant Schlorff (the "FY22 Earnings Release").

191. The FY22 Earnings Release reported that SeaStar's total assets amounted to approximately $4.77 million, while its total liabilities amounted to approximately $13 million, detailing, in pertinent part, that:

> The Company reported cash of $47,000 as of December 31, 2022, compared with $510,000 as of December 31, 2021. ***At the closing of the merger agreement in October 2022, the Company entered into forward purchase agreements of shares and warrants with the potential to generate up to $10 million in proceeds, depending on the market price of shares***. The Company also entered into a $100 million equity line of credit. In March 2023 SeaStar Medical closed a $3.3 million first tranche of a $9.8 million private placement convertible debt offering.
>
> ****
>
> ***Other expense for 2022 was $11.4 million, compared with $0.2 million for 2021, with the increase primarily resulting from a loss in change in fair value of forward option of $10.2 million***, a loss in change in fair value of convertible notes derivative liability of $0.6 million, and an increase in interest expense of $0.4 million.
>
> ***The net loss for 2022 was $23.0 million, or $2.80 per share,*** compared with a net loss for 2021 of $4.6 million, or $0.63 per share. The increase in net loss for 2022 primarily resulted from increases in G&A expenses of $4.9 million, increases in R&D expenses of $0.1 million, origination cost of forward contracts of $2.2 million, and increases in other expense of $11.2 million.
>
> (Emphasis added).

192. The statements identified above are materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts, including that the Company: (1) improperly classified its Private Placement Warrants, PIPE Warrants, and Forward Purchase Agreements, and failed to account for all liabilities on its balance sheet; (2) as a result, materially overstated its financial results

during the Affected Periods; (3) had not prepared its financial results in accordance with GAAP; (4) lacked adequate and effective internal controls over financial reporting; and (5) as a result, issued materially false and misleading financial statements at all relevant times.

193. With respect to the Company's regulatory approval process and near-term business and financial prospects, the FY22 Earnings Release stated, in relevant part:

> We anticipate our first U.S. regulatory approval for the SCD will be for pediatric patients with AKI being treated in the ICU with CKRT. About a quarter of pediatric AKI patients who enter the ICU stay there twice as long as pediatric patients without AKI, and about half of those die. Many of those who survive suffer with long-term chronic diseases.
>
> - ***In June 2022 we submitted an Humanitarian Device Exemption application to the FDA***, having met the criteria with clinical results showing safety and probable clinical benefit to critically ill children with AKI who have few treatment options. A non-controlled pivotal study funded by the FDA Office of Orphan Products Development showed that those treated with the SCD had no reported adverse events, a 50% reduction in mortality rate and no dialysis required at Day 60. The U.S. addressable population of about 4,000 pediatric patients is within the 8,000-patient HDE criteria.
>
> - ***We continue active discussions with the FDA regarding the HDE application and remain hopeful for a near-term determination.***
>
> - We have a license and distribution agreement with Nuwellis for the pediatric AKI indication, with an initial commercial focus on the top 50 U.S. hospitals that treat pediatric AKI patients. Nuwellis' salesforce has established relationships with nephrologists and intensive care physicians who are trained in pediatric extracorporeal therapy. This agreement allows us to focus on additional clinical applications with the SCD without the expense of hiring and training a commercial team.
>
> (Emphasis added).

194. The FY22 Earnings Release also quoted Defendant Schlorff as saying: "***We are focusing on executing near-term milestones that will advance our business***[.] … ***Our immediate efforts are aimed at*** raising awareness with the medical community of our cell-directed extracorporeal therapy's potential for playing a life-saving role for critically ill patients, ***working with regulators to bring products to market***, and ensuring we have the systems and processes in place to serve market needs" (emphasis added).

195. The statements identified above are materially false and/or misleading because (i) SeaStar did not submit the HDE Application until July 1, 2022; (ii) SeaStar had deficient compliance controls and procedures related to the HDE Application resulting in the need for multiple amendments to provide the necessary information regarding the device for the FDA to complete its review; and (iii) because there were deficiencies with the HDE Application, the FDA was unlikely to approve the HDE Application in its present form, and the SCD's regulatory prospects were overstated.

196. Also on March 30, 2023, SeaStar filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and fiscal year ended December 31, 2022 (the "2022 10-K"), signed by Defendants Schlorff and Baron.

197. With respect to the Company's regulatory approval process and near-term business and financial prospects, the 2022 10-K stated, in relevant part:

> As of December 31, 2022, our SCD has been used in approximately 170 adult and pediatric patients on an investigational basis. ***In June 2022, we submitted a humanitarian device exemption ('HDE') application with the U.S. Food & Drug Administration ('FDA') for pediatric patients***

> ***with acute kidney injury ('AKI') on CRRT. Based on the current timeline of the HDE application, we expect the FDA to complete its substantive review of our HDE application during the first half of 2023***; however, there is no guarantee that the FDA will approve our HDE application. …
>
> ****
>
> ***We submitted an HDE application for SCD for the treatment of pediatric patients with acute kidney injury undergoing CRRT with the FDA in June 2022. We expect the FDA to complete substantive review of the HDE application by the first half of 2023***.

(Emphasis added).

198. In addition, despite the FDA's clear advisories providing a shortened review period for HDE applications (*i.e.* 75 days), the FY22 10-K supported Defendants' touted timeline providing the Company's "Pre-market Approval Pathway" as follows:

> A pre-market approval application must be submitted to the FDA for Class III devices for which the FDA has required a PMA. The pre-market approval application process is more extensive than the 510(k) pre-market notification and de novo request processes. A PMA application must be supported by extensive data, including but not limited to technical, preclinical, clinical trials, manufacturing and labeling to demonstrate to the FDA's satisfaction reasonable evidence of safety and effectiveness of the device.
>
> After a pre-market approval application is submitted, the FDA has 45 days to determine whether the application is sufficiently complete to permit a substantive review and thus whether the FDA will file the application for review. The FDA has 180 days of FDA review time to review a filed pre-market approval application, although the review of an application generally occurs over a significantly longer period of time due to hold periods during which the submitting sponsor (the company) gathers information to address FDA requests for additional information. The total review process is highly variable and can take up to several years. During this review period, the FDA may request additional information or clarification of the information already provided. Also, an advisory panel of experts from outside the FDA may be convened to review and evaluate the application and provide recommendations to the FDA as to the approvability of the device.

> Although the FDA is not bound by the advisory panel decision, the panel's recommendations are important to the FDA's overall decision-making process. In addition, the FDA generally conducts a pre-approval inspection of the manufacturing facilities to ensure compliance with the Quality System Regulation ("QSR"). The agency also may inspect one or more clinical sites to assure compliance with FDA's regulations.
>
> Upon completion of the PMA review, the FDA may: (i) approve the PMA that authorizes commercial marketing with specific prescribing information for one or more indications, which can be more limited than those originally sought; (ii) issue an approvable letter that indicates the FDA's belief that the PMA is approvable and states what additional information the FDA requires, or the post-approval commitments that must be agreed to prior to approval; (iii) issue a not approvable letter that outlines steps required for approval, but which are typically more onerous than those in an approvable letter, and may require additional clinical trials that are often expensive and time consuming and can delay approval for months or even years; or (iv) deny the application. If the FDA issues an approvable or not approvable letter, the applicant has 180 days to respond, after which the FDA's review clock is reset.

199. The statements identified above are materially false and/or misleading because (i) SeaStar did not submit the HDE Application until July 1, 2022; (ii) SeaStar had deficient compliance controls and procedures related to the HDE Application resulting in the need for multiple amendments to provide the necessary information regarding the device for the FDA to complete its review; and (iii) because there were deficiencies with the HDE Application, the FDA was unlikely to approve the HDE Application in its present form, and the SCD's regulatory prospects were overstated. Additionally, Defendants created the false impression that SeaStar's regulatory review process was not substantially delayed by providing the longer 180-day review period for PMA applications, not the applicable 75-day review period for HDE applications.

200. The Company's FY22 10-K also affirmed that SeaStar's total assets amounted to approximately $4.77 million, while the Company's total liabilities amounted to approximately $13 million, for the year ended December 31, 2022.

201. With respect to SeaStar's various warrants and the classification of those warrants, under "Note 10. Warrants," the FY22 10-K provided, in relevant part:

> As part of LMAO's initial public offering, under the Warrant Agreement dated as of January 25, 2021 and, prior to the effectiveness of the Business Combination, LMAO issued 10,350,000 warrants each of which entitled the holder to purchase one share of common stock at an exercise price of $11.50 per share ("Public Stockholders' Warrants"). Simultaneously with the closing of the Initial Public Offering, LMAO completed the private sale of 5,738,000 million warrants each of which entitled the holder to purchase one share of common stock at an exercise price of $11.50 per share, to LMAO's sponsor ("Private Placement Warrants"). Upon the effectiveness of the Business Combination, the outstanding Public Stockholders' Warrants and Private Placement Warrants automatically converted into warrants of SeaStar Medical Holding Corporation. ***The Company has reviewed the terms of the warrants to determine whether the warrants should be classified as liabilities or stockholders' deficit in its consolidated balance sheets. In order for a warrant to be classified in stockholders' deficit, the warrant must be (a) indexed to the Company's equity and (b) meet the conditions for equity classification in ASC 815-40, Derivatives and Hedging-Contracts in an Entity's own Equity. If a warrant does not meet the conditions for equity classification, it is carried on the consolidated balance sheets as a warrant liability measured at fair value, with subsequent changes in the fair value of the warrant recorded in the consolidated statements of operations as change in fair value of warrants. The Company determined that the warrants are required to be classified as stockholders' deficit as of the date of the Business Combination***. The Company has the ability to redeem outstanding Public Shareholders' Warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that the last reported sales price of our common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, and the like) for any 20 trading days within a 30 day trading-day period. The Company does not have the ability to redeem the Private Placement Warrants. The Private Placement Warrants were valued at $6,688 at the date of the Business Combination date. On

> December 31, 2022, there were 10,350,000 Public Shareholders' Warrants outstanding and 5,738 Private placement Warrants outstanding.
>
> On October 28, 2022, the Company entered into a Private Investment in Public Equity ("PIPE") Agreement, pursuant to which the PIPE investors purchased an aggregate of 700,000 shares of common stock at $10.00 per share and received 700,000 PIPE Investor Warrants, which entitled the holder to purchase one share of common stock of SeaStar Medical Holding Corporation at $11.50 per share, for an aggregate purchase price of $7,000. At December 31, 2022, there were 700,000 PIPE Investor Warrants outstanding, ***which are accounted for as equity.***
>
> (Emphasis added).

202. Under "Note 4. Forward Purchase Agreements," the FY22 10-K provided, in relevant part, that:

> ***In accordance with ASC 815, Derivatives and Hedging, the Company has determined that the forward option within the Forward Purchase Agreements (i) is a freestanding financial instrument (ii) does not meet the definition of a derivative, (iii) is indexed to the Company's own stock, and (iv) does not meet the requirements for equity classification.*** The fair value of the option is recorded as an asset or a liability on the Consolidated Balance Sheets as forward option-prepaid forward contracts. The Company has performed fair value measurements for the forward option within the FPAs as of the Closing and as of December 31, 2022, which is described in Note 2. The Company remeasures the fair value of the forward option each reporting period.
>
> The initial value of the Forward option-prepaid forward contracts was $11,940 at Closing. Recycled Shares with a value of $41 were sold by the FPA Sellers. A loss on remeasurement of $10,170 was recorded in Change in fair value of forward option on the consolidated statements of operations for the year ended December 31, 2022. On December 31, 2022, the value of the forward option within the FPAs was $1,729 and recorded as Forward option-prepaid forward contracts on the consolidated balance sheets.
>
> (Emphasis added).

203. In addition, the FY22 10-K downplayed the true scope and severity of deficiencies in SeaStar's financial controls and procedures, while simultaneously touting Defendants' efforts to remediate the same, stating, in relevant part:

> In the course of preparing the consolidated financial statements that are included in this Annual Report, the Company has identified material weaknesses in its internal controls over financial reporting as of December 31, 2022, which relates to a deficiency in the design and operation of its financial accounting and reporting controls. … Specifically, the Company identified deficiencies in internal controls over financial reporting which were determined to rise to the level of material weakness. The Company has identified that additional headcount will be addressed in the near term to allow for further research and internal dialogue on complex accounting transactions prior to final conclusion. The Company will also continue to review the overall internal control environment as we develop the requisite internal control framework.

204. The FY22 10-K described the following "Risk Factors" as potential and not yet materialized risks:

> ***SeaStar Medical identified a material weakness in its internal control over financial reporting. If the Company is unable to develop and maintain an effective system of internal controls over financial reporting, the Company may not be able to accurately report its financial results in a timely manner, which may materially and adversely affect the Company's business, results of operations and financial condition.***
>
> The Company's management is responsible for establishing and maintaining adequate internal controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with U.S. GAAP. The Company's management also evaluates the effectiveness of its internal controls, and the Company discloses any changes and material weaknesses identified through such evaluation of its internal controls. A material weakness is a deficiency, or a combination of deficiencies, in the internal controls over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

In the course of preparing the consolidated financial statements that are included in this Annual Report, SeaStar Medical has identified material weaknesses in its internal controls over financial reporting as of December 31, 2022, which relates to a deficiency in the design and operation of its financial accounting and reporting controls. Specifically, the material weakness resulted from a lack of segregation of duties within the financial accounting and reporting processes, including the absence of an independent review and approval process in recording transactions to the consolidated financial statements, disbursement and payroll systems. While the Company intends to implement measures to remediate the material weakness including hiring additional accounting staff with requisite experiences and skills, there is no guarantee that it can be remediated in a timely fashion or at all. The Company's failure to correct this material weakness could result in inaccurate consolidated financial statements and could also impair its ability to comply with the applicable financial reporting requirements on a timely basis. These compliance issues could cause investors to lose confidence in the Company's reported financial information and may result in volatility in and a decline in the market price of the Company's securities.

As discuss in Item 9A below, the Company was unable, without incurring unreasonable effort or expense, to conduct an assessment of our internal control over financial reporting as of December 31, 2022. Accordingly, the Company is excluding management's report on internal control over financial reporting pursuant to Section 215.02 of the SEC Division of Corporation Finance's Regulation S-K Compliance & Disclosure Interpretations. While the Company is currently taking steps to develop and enhance its internal control process the Company's management may conclude that its internal control over financial reporting is not effective, or the level at which the Company's controls are documented, designed, or reviewed is not adequate, and may result in the Company's independent registered public accounting firm issuing a report that is qualified. In addition, the reporting obligations may place a significant strain on the Company's management, operational and financial resources and systems for the foreseeable future. The Company may be unable to complete its evaluation testing and any required remediation in a timely manner.

During the course of documenting and testing the Company's internal control procedures, in order to satisfy the requirements of Section 404, the Company may subsequently identify deficiencies in its internal control over financial reporting. Moreover, if the Company fails to maintain the adequacy of its internal control over financial reporting, as these standards are modified, supplemented, or amended from time to time, it may not be

> able to conclude on an ongoing basis that it has effective internal control over financial reporting in accordance with Section 404. If the Company fails to achieve and maintain an effective internal controls environment, it could result in material misstatements in its consolidated financial statements and a failure to meet its reporting obligations, which may cause investors to lose confidence in its reported financial information. This could in turn limit the Company's access to capital markets and harm its results of operations. The Company may also be required to restate its consolidated financial statements from prior periods if such deficiencies are identified. Additionally, ineffective internal control over financial reporting could expose it to increased risk of fraud or misuse of corporate assets and subject it to potential delisting from Nasdaq, regulatory investigations and civil or criminal sanctions. All of these consequences could adversely impact the Company's reputation, business, results of operations, financial condition and share price.
>
> (Emphasis in original).

205. The statements identified above are materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts, including that the Company: (1) improperly classified its Private Placement Warrants, PIPE Warrants, and Forward Purchase Agreements, and failed to account for all liabilities on its balance sheet; (2) as a result, materially overstated its financial results during the Affected Periods; (3) had not prepared its financial results in accordance with GAAP; (4) lacked adequate and effective internal controls over financial reporting; and (5) as a result, issued materially false and misleading financial statements at all relevant times.

206. On May 15, 2023, SeaStar issued a press release announcing its first quarter 2023 financial results and providing a business update, filed as Exhibit 99.1 to a current report filed with the SEC on Form 8-K, signed by Defendant Schlorff. The

Company's May 15, 2023 press release provided an update on the Company's regulatory prospects stating, in relevant part:

> We anticipate our first U.S. regulatory approval for the SCD will be for pediatric patients with AKI being treated in the ICU with CKRT. About one-half of children in the ICU with AKI who require CKRT survive, with those surviving at risk of long-term life-threatening conditions such as chronic kidney disease.
>
> - ***In June 2022 we submitted an HDE application to the FDA***, having met the criteria with clinical results showing safety and probable clinical benefit to critically ill children with AKI who have few treatment options. A non-controlled pivotal study funded by the FDA Office of Orphan Products Development showed that those treated with the SCD had no reported adverse events, a 50% reduction in mortality rate and no dialysis required at Day 60. The U.S. addressable population of about 4,000 pediatric patients is within the 8,000-patient HDE criteria.
>
> - ***In May 2023 we received a letter from the FDA indicating that the application is not approvable in its current form*** and outlining specific guidance as to how the application may be amended and resubmitted. We believe that ***each deficiency cited in the letter is readily addressable and have put in place a plan with the goal of achieving pediatric HDE approval***. In parallel we have initiated the administrative review and have a further option to appeal. We anticipate that this process could take between 90 and 120 days.

(Emphasis added).

207. The press release also quoted Defendant Schlorff as stating, in relevant part, that "[f]ollowing the recent receipt of a non-approvable letter, we are working with the FDA to secure a Humanitarian Device Exemption (HDE) for use of the SCD to treat critically ill children with AKI, and ***are now targeting approval in late 2023***" (emphasis added).

208. The statements identified above are materially false and/or misleading because (i) SeaStar did not submit the HDE Application until July 1, 2022; (ii) SeaStar had deficient compliance controls and procedures related to the HDE Application resulting in the need for multiple amendments to provide the necessary information regarding the device for the FDA to complete its review; and (iii) because SeaStar had deficient compliance controls and procedures, the identified deficiencies with the HDE Application were not readily addressable, the FDA was likely to issue an Approvable Letter prior to any final Approval Order, and the SCD's regulatory prospects were overstated.

209. The May 15, 2023 press release reported that the Company's total liabilities amounted to $14.27 million, that net total other expenses amounted to $521,000, and that net loss amounted to approximately $5.3 million for the quarter, detailing, in pertinent part:

> ***Other expense for the first quarter of 2023 was $0.5 million***, compared with other expense of $0.2 million for the first quarter of 2022. The increase primarily resulted from the change in fair value of forward option-prepaid forward contracts and tranche rights, and loss on issuance of convertible notes, partially offset by the change in fair value of convertible notes and a gain on sales of recycled shares.
>
> ***The net loss for the first quarter of 2023 was $5.3 million***, or $0.40 per share, compared with a net loss of $1.0 million, or $0.14 per share, for the first quarter of 2022.
>
> The Company reported cash of $725,000 as of March 31, 2023, compared with $47,000 as of December 31, 2022. ***At the closing of the merger agreement in October 2022, the Company entered into forward purchase agreements of shares and warrants with the potential to generate up to $10 million in proceeds, depending on the market price of shares***. The Company also entered into a $100 million equity line of credit. In March 2023 the Company closed a $3.3 million first tranche of

> a $9.8 million private placement convertible debt offering, and in recently closed on the second tranche of $2.2 million.

(Emphasis added).

210. Also on May 15, 2023, SeaStar filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2023 (the "1Q23 10-Q"), signed by Defendants Schlorff and Baron. The 1Q23 10-Q affirmed that, *inter alia*, SeaStar's total liabilities for the first quarter amounted to $14.27 million; its net loss amounted to approximately $5.3 million; and its total other expenses amounted to $681,000.

211. The 1Q23 10-Q, under "Note 3. Forward Purchase Agreements," provided, in relevant part:

> During the three months ended March 31, 2023, 374,005 recycled shares were sold by Forward Purchase Agreement Sellers ('FPA Sellers'). The Company received $1,870 for the shares sold and recognized a gain of $1,306 on the sale. There were 773,400 recycled shares remaining on March 31, 2023. A loss on remeasurement of $1,654 was recorded in Change in fair value of forward option on the unaudited consolidated statements of operations. On March 31, 2023, the value of the forward option within the Forward Purchase Agreements ('FPA') was a liability of $489 and was recorded as Forward option-prepaid forward contracts on the unaudited consolidated balance sheets on March 31, 2023.

212. When discussing the basis of presentation for the 1Q23 10-Q, the Company asserted, in relevant part, that:

> The accompanying unaudited consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ('U.S. GAAP') and the rules and regulations of the Securities and Exchange Commission ('SEC') for interim reporting. As permitted under those rules and regulations, certain notes or other financial information normally included in financial statements prepared in accordance with U.S. GAAP have been condensed or omitted. The interim unaudited consolidated financial statements have been

> prepared on the same basis as the annual consolidated financial statements and, in the opinion of management, reflect all adjustments, which include only normal, recurring adjustments that are necessary to present fairly the Company's results for the interim periods presented. The results from operations for the three months ended March 31, 2023, are not necessarily indicative of the results to be expected for the year ended December 31, 2023, or for any future annual or interim period.
>
> The accompanying interim unaudited consolidated financial statements should be read in conjunction with the annual consolidated financial statements and the related notes for the year ended December 31, 2022. There have been no material changes in our significant accounting policies as described in our Annual Report on Form 10-K for the year ended December 31, 2022.

213. The statements identified above are materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts, including that the Company: (1) improperly classified its Private Placement Warrants, PIPE Warrants, and Forward Purchase Agreements, and failed to account for all liabilities on its balance sheet; (2) as a result, materially overstated its financial results during the Affected Periods; (3) had not prepared its financial results in accordance with GAAP; (4) lacked adequate and effective internal controls over financial reporting; and (5) as a result, issued materially false and misleading financial statements at all relevant times.

214. On August 14, 2023, SeaStar issued a press release announcing its second quarter 2023 financial results and providing a business update, filed as Exhibit 99.1 to a current report filed with the SEC on Form 8-K, signed by Defendant Schlorff. The Company's August 14, 2023 press release reported that the Company's total liabilities amounted to approximately $13.78 million for the quarter, and that net total

other expenses amounted to $595,000, while net loss amounted to approximately $3.7 million for the quarter.

215. Also on August 14, 2023, SeaStar filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2023 (the "2Q23 10-Q"), signed by Defendants Schlorff and Baron. The 2Q23 10-Q affirmed that SeaStar's total liabilities amounted to approximately $13.78 million for the quarter, and that net total other expenses amounted to $595,000, while net loss amounted to approximately $8.93 million, for the six months ended June 30, 2023.

216. With respect to the Forward Purchase Agreements and SeaStar's accounting for the same, the 2Q23 10-Q stated, in relevant part:

> During the six months ended June 30, 2023, 374,005 recycled shares were sold by Forward Purchase Agreement Sellers ("FPA Sellers"). The Company received $1,870 for the shares sold and recognized a gain of $1,306 on the sale. Losses on remeasurement of $69 and $1,723 were recorded in Change in fair value of forward option-prepaid forward contracts on the unaudited condensed consolidated statements of operations for the three and six months ended June 30, 2023, respectively.
>
> In March 2023, the price of the Company stock was below $3.00 for more than 20 trading days and the FPA Sellers at their discretion had the ability to specify the maturity dates for the FPA. During the three months ended June 30, 2023, the FPA Sellers specified the maturity dates and the FPAs matured and were settled by transferring 1,096,972 shares to the FPA Sellers, with a fair value of $558. As the FPAs were classified as a liability at fair value, upon settlement, the FPAs were marked to their fair value at the settlement dates and the liability was settled.

217. When discussing the basis of presentation for the 2Q23 10-Q, the Company asserted, in relevant part, that:

> The accompanying unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ('U.S. GAAP') and the rules and regulations of the Securities and Exchange Commission ('SEC') for interim reporting. As permitted under those rules and regulations, certain notes or other financial information normally included in financial statements prepared in accordance with U.S. GAAP have been condensed or omitted. The interim unaudited condensed consolidated financial statements have been prepared on the same basis as the annual condensed consolidated financial statements and, in the opinion of management, reflect all adjustments, which include only normal, recurring adjustments that are necessary to present fairly the Company's results for the interim periods presented. The results from operations for the three and six months ended June 30, 2023, are not necessarily indicative of the results to be expected for the year ended December 31, 2023, or for any future annual or interim period.
>
> The accompanying interim unaudited condensed consolidated financial statements should be read in conjunction with the annual condensed consolidated financial statements and the related notes for the year ended December 31, 2022. There have been no material changes in our significant accounting policies as described in our Annual Report on Form 10-K for the year ended December 31, 2022.

218. The statements identified above are materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts, including that the Company: (1) improperly classified its Private Placement Warrants, PIPE Warrants, and Forward Purchase Agreements, and failed to account for all liabilities on its balance sheet; (2) as a result, materially overstated its financial results during the Affected Periods; (3) had not prepared its financial results in accordance with GAAP; (4) lacked adequate and effective internal controls over financial reporting; and (5) as a result, issued materially false and misleading financial statements at all relevant times.

219. On October 3, 2023, the Company issued a press release entitled, "SeaStar Medical Provides Regulatory Update Regarding Selective Cytopheretic Device Use in Pediatric Acute Kidney Injury Under a Humanitarian Device Exemption," announcing its receipt of:

> [A] correspondence from the U.S. Food and Drug Administration's (FDA) Center for Biologics Evaluation and Research (CBER) indicating that ***the Agency considers the Selective Cytopheretic Device (SCD) Pediatric (SCD-PED) to be approvable under a Humanitarian Device Exemption (HDE)*** for use in children weighing 10 kilograms or more with acute kidney injury (AKI) and sepsis or a septic condition requiring continuous kidney replacement therapy (CKRT) in the hospital intensive care unit (ICU).
>
> The correspondence further indicates that ***an Approvable Letter, which is a standard part of CBER's approval process***, is expected to be issued within a month. The Approvable Letter will outline conditions, including language for safety, probable benefit and labeling for intended use, which will be required for formal marketing approval.
>
> (Emphasis added).

220. The statements identified above are materially false and/or misleading because Defendants misrepresented the content and significance of an Approvable Letter. Pursuant to applicable federal regulations, an Approvable Letter does not represent the Agency's acceptance of the underlying device as "approvable" under HDE but rather that the FDA considers the HDE application approvable pending the resolution of identified deficiencies or an GMP inspection letter. Further, Defendants created the false impression that an Approvable Letter was the natural next step in achieving final marketing approval. During the FDA's substantive review process, it may act by issuing an Approval Order, Approvable Letter, Major Deficiency Letter, Not Approvable Letter, *or* Denial Order. None of these actions are a prerequisite to the next.

221. Defendant Schlorff is quoted in the press release as stating, in relevant part:

> ***The correspondence provides a clear path forward in making this much needed therapy accessible to critically ill children suffering with AKI and sepsis***[.] … We understand the agency's appropriate caution in these medically fragile septic patients whose care requires significant resources, and we appreciate the agency's willingness to work collaboratively with SeaStar Medical and our advisors to review the HDE application, as well as its recognition of SCD as a therapy with probable benefit for these children. ***This is an important milestone for SeaStar Medical, and we intend to follow the regulatory path laid out by the FDA to commercialize SCD for this indication by the end of 2023***.

(Emphasis added).

222. On October 5, 2023, the Company issued a press release announcing SeaStar's plans to present at the Dawson James Small Cap Growth Conference on October 12, 2023. In pertinent part, the press release quoted Defendant Schlorff as saying, "We are excited to share two very recent transformational regulatory development at this conference[.] … The FDA has informed us to expect an Approvable Letter within a month for use of our Selective Cytopheretic Device (SCD) Pediatric in critically ill children with acute kidney injury and sepsis or septic conditions, ***providing us with clear path toward the first market approval for our patented cell-directed extracorporeal therapy***" (emphasis added).

223. The statements identified above are materially false and/or misleading because the receipt of an Approvable Letter does not provide an applicant with a "clear path" toward market approval, rather an Approvable Letter is issued to identify deficiencies in an HDE application or to inform the applicant that an GMP inspection is needed. Indeed, the receipt of an Approvable Letter stops the FDA's review clock and

places the application on hold until the FDA determines that an applicant has provided a complete response to the identified deficiencies or an GMP inspection letter is received. Accordingly, the SCD's regulatory prospects were overstated.

224. Further, Defendants created the false impression that an Approvable Letter was the natural next step in achieving final marketing approval. During the FDA's substantive review process, it may act by issuing an Approval Order, Approvable Letter, Major Deficiency Letter, Not Approvable Letter, *or* Denial Order. None of these actions are a prerequisite to the next.

225. On November 14, 2023, SeaStar issued a press release announcing its third quarter 2023 financial results and providing a business update, filed as Exhibit 99.1 to a current report filed with the SEC on Form 8-K, signed by Defendant Schlorff. The press release reported that the Company's total liabilities amounted to $18.15 million for the quarter, and that net total other expenses amounted to approximately $5.1 million, while net loss amounted to approximately $16.4 million, for the nine months ended September 30, 2023.

226. Also on November 14, 2023, SeaStar filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2023 (the "3Q23 10-Q"), signed by Defendants Schlorff and Baron. The 3Q23 10-Q affirmed that SeaStar's total liabilities amounted to $18.15 million for the quarter, and that net total other expenses amounted to approximately $5.1 million, while net loss amounted to approximately $16.4 million, for the nine months ended September 30, 2023.

227. With respect to the Forward Purchase Agreements and SeaStar's accounting for the same, the 3Q23 10-Q stated, in relevant part:

> During the nine months ended September 30, 2023, 374,005 recycled shares were sold by Forward Purchase Agreement Sellers ("FPA Sellers"). The Company received $1,870 for the shares sold and recognized a gain of $1,306 on the sale. Losses on remeasurement of $0 and $1,723 were recorded in Change in fair value of forward option-prepaid forward contracts on the unaudited condensed consolidated statements of operations for the three and nine months ended September 30, 2023, respectively.
>
> In March 2023, the price of the Company stock was below $3.00 for more than 20 trading days and the FPA Sellers at their discretion had the ability to specify the maturity dates for the Forward Purchase Agreements ("FPA"). During the nine months ended September 30, 2023, the FPA Sellers specified the maturity dates and the FPAs matured and were settled by transferring 1,096,972 shares to the FPA Sellers, with a fair value of $558. As the FPAs were classified as a liability at fair value, upon settlement, the FPAs were marked to their fair value at the settlement dates and the liability was settled.

228. When discussing the basis of presentation for the 3Q23 10-Q, the Company asserted, in relevant part, that:

> The accompanying unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ('U.S. GAAP') and the rules and regulations of the Securities and Exchange Commission ('SEC') for interim reporting. As permitted under those rules and regulations, certain notes or other financial information normally included in financial statements prepared in accordance with U.S. GAAP have been condensed or omitted. The interim unaudited condensed consolidated financial statements have been prepared on the same basis as the annual condensed consolidated financial statements and, in the opinion of management, reflect all adjustments, which include only normal, recurring adjustments that are necessary to present fairly the Company's results for the interim periods presented. The results from operations for the three and nine months ended September 30, 2023, are not necessarily indicative of the results to be expected for the year ended December 31, 2023, or for any future annual or interim period.

> The accompanying interim unaudited condensed consolidated financial statements should be read in conjunction with the annual condensed consolidated financial statements and the related notes for the year ended December 31, 2022. There have been no material changes in our significant accounting policies as described in our Annual Report on Form 10-K for the year ended December 31, 2022.

229. The statements identified above are materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts, including that the Company: (1) improperly classified its Private Placement Warrants, PIPE Warrants, and Forward Purchase Agreements, and failed to account for all liabilities on its balance sheet; (2) as a result, materially overstated its financial results during the Affected Periods; (3) had not prepared its financial results in accordance with GAAP; (4) lacked adequate and effective internal controls over financial reporting; and (5) as a result, issued materially false and misleading financial statements at all relevant times.

## VI. ADDITIONAL ALLEGATIONS PROBATIVE OF SCIENTER

230. During the Class Period, Defendants had both the motive and opportunity to commit fraud. As a SPAC, SeaStar's value to investors relied primarily, if not entirely, on Defendants' ability to close a merger with another company or entity of promising value. Accordingly, Defendants widely touted the regulatory and commercial prospects of SeaStar Legacy's SDE product in the months leading up to LMAO's stockholder meeting to approve the Business Combination. Defendants also had actual knowledge of the misleading nature of the statements they made during the Class Period or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and

participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

231. Indeed, numerous facts alleged in Section IV, *supra*, viewed collectively and holistically, raise a strong inference that the Individual Defendants knew or, at minimum, were reckless in disregarding the true facts regarding the status of SeaStar's regulatory approval process and the nature of the Company's financial instruments, and that each of the false and misleading statements set forth in Section V, *supra*, were materially false and misleading and/or omitted material adverse information. In addition to the allegations set forth above, the following facts further support a strong inference of scienter.

### A. SeaStar Had Ample Time to Study and Evaluate ASC Topic 815

232. SeaStar had ample time to study and evaluate ASC Topic 815 and determine the effect such guidance would have on its financial reporting following the closing of the Business Combination and with it, the Subscription Agreements and Forward Purchase Agreements. Indeed, as noted herein, SeaStar's management was *required* to evaluate all applicable GAAP principles to ensure the accuracy and completeness of the Company's financial reporting.

233. ASC Topic 815 is a well-established GAAP principle. In 2017, the FASB issued Accounting Standards Update ("ASU") No. 2017-12, *Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities,* to better portray the economic results of an entity's risk management activities in its financial

statements and to make certain targeted improvements to simplify the application of the hedge accounting guidance.

234. On August 5, 2020, the FASB issued ASU No. 2020-06, *Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging—Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity*, which further simplified the accounting for certain financial instruments with characteristics of liabilities and equity, including convertible instruments and contracts on an entity's own equity.

235. ASU No. 2020-06 received widespread media attention when it was first announced, including articles published in the CPA Journal and by Bloomberg, and numerous prominent accounting firms, like Deloitte and KPMG, published guides to help company executives understand key provisions, transition requirements, and effective dates.

236. The SEC has also published numerous Staff Statements addressing various accounting, financial reporting and governance issues that the agency instructed should be carefully considered before a de-SPAC transaction occurs.

237. Indeed, on March 31, 2021, the SEC's Division of Corporation Finance issued a Staff Statement on Select Issues Pertaining to Special Purpose Acquisition Companies addressing, *inter alia*, issuers' reporting obligations under the "books and records" provision—requiring issuers to maintain books, records, and accounts in reasonable detail that accurately and fairly reflect the issuer's transactions and dispositions of its assets—and the "internal controls" provision—requiring issuers to

devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances about management's control, authority, and responsibility over the issuer's assets.

238. That same day, the SEC published a Statement on Financial Reporting and Auditing Considerations of Companies Merging with SPACs written by Paul Munter, Acting Chief Accountant, highlighting some of the key considerations related to de-SPAC transactions, including, *inter alia*, timing and marketing considerations such that "[i]t is essential for the combined public company to have a capable, experienced management team that understands what the reporting and internal control requirements and expectations are of a public company and can effectively execute the company's comprehensive plan;" financial reporting considerations such that "the combined public company should have finance and accounting professional with sufficient knowledge of the relevant reporting requirements;" and internal control considerations such that target companies understand public companies are "required to maintain internal control over financial reporting ('ICFR') and disclosure controls and procedures ('DCP')" and "have a plan in place for the combined company to comply with those requirements on a timely basis."

239. Mr. Munter offered a reminder that the Office of the Chief Accountant was available for consultation on accounting and financial reporting relating to de-SPAC transactions and encouraged stakeholders to contact their office with any questions that arise in advance of or during de-SPAC transactions.

240. Likewise, on April 21, 2021, the SEC issued a Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs"), co-authored by John Coates, Acting Director, Division of Corporation Finance and Mr. Munter, Acting Chief Accountant. As detailed below, prior to the closing of the Business Combination, LMAO made specific references to this SEC Statement in its public filings.

241. The April 21, 2021 SEC Statement was issued to highlight the potential accounting implications of certain terms that were considered common in warrants included in SPAC transactions and to discuss the financial reporting considerations that apply if a registrant and its auditors determine there is an error in any previously-filed financial statements.

242. In particular, this SEC Statement focused on indexation and tender offer provisions. When discussing indexation, the SEC explained that:

> An equity-linked financial instrument (or embedded feature) must be considered indexed to an entity's own stock in order to qualify for equity classification. While many instruments include a fixed strike price or a fixed number of shares used to calculate the settlement amount, other instruments may include variables that could affect the settlement amount. Such variables do not preclude a conclusion that the instrument is indexed to an entity's own stock if the variables would be inputs to the fair value of a fixed-for-fixed forward or option on equity shares. To assist in an entity's evaluation, GAAP includes a list of such inputs.

243. The April 21, 2021 SEC Statement specifically highlighted the relevant fact pattern where "the warrants included provisions that provided for potential changes to the settlement amounts dependent upon the characteristics of the holder of the warrant," just like LMAO's Private Placement and PIPE Warrants. The SEC Statement

went on to conclude that under this scenario, "[b]ecause the holder of the instrument is not an input into the pricing of a fixed-for-fixed option on equity shares…such a provision would preclude the warrants from being indexed to the entity's stock, and thus the warrants should be classified as a liability measured at fair value, with changes in fair value each person reported in earnings."

244. Similarly, when discussing tender offer provisions requiring liability classification, the April 21, 2021 SEC Statement highlighted a fact pattern where the terms of warrants issued by a SPAC "included a provision that in the event of a tender or exchange offer made to and accepted by holders of more than 50% of the outstanding shares of a single class of common stock, all holders of the warrants would be entitled to receive cash for their warrants," just like the warrants issued in connection with LMAO's IPO. "In other words, in the event of a qualifying cash tender offer (which could be outside the control of the entity), all warrant holders would be entitled to cash, while only certain of the holders of the underlying shares of common stock would be entitled to cash." The SEC Statement went on to conclude that under this scenario, "the tender offer provision would require the warrants to be classified as a liability measured at fair value, with changes in fair value reported each period in earnings."

245. Accordingly, investors reasonably assumed that Defendants—given the ample time they were afforded to evaluate the proper application of the highly publicized accounting standard on SeaStar's financial results—conducted an intentionally detailed, well-researched investigation into the mandates of ASC Topic 815 prior to issuing the materially false and misleading statements alleged herein.

**B. The Individual Defendants Certified SeaStar's Class Period Statements**

246. Included as Exhibits 31 and 32 to the Company's Form 10-Qs and Form 10-Ks filed with the SEC, during the Class Period, were management certifications, pursuant to Rule 13a-14 and 15d-14 of the Exchange Act ("Exchange Act Certification") and Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C § 1350 ("SOX Certification"), signed by each of the Individual Defendants.

247. In signing the Exchange Act Certification, each of the Individual Defendants certified that:

1. I have reviewed this [quarterly or annual] report on [Form 10-Q or Form 10-K] of SeaStar Medical Holding Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the period presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the

preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

248. In signing the SOX Certification, each of the Individual Defendants certified that: "(1) the [Report] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

249. The personal participation of each Individual Defendant in designing and maintaining the Company's internal controls over financial reporting supports their knowledge of the unreliability of SeaStar's Class Period statements and failure to comply with GAAP.

**C. Suspicious Timing of Senior-Level Departures, the Termination of LMAO's Independent Accounting Firm and Subsequent Resignation of SeaStar's Independent Accounting Firm**

250. Prior to the Business Combination, MaloneBailey, LLP ("MaloneBailey") served as principal accountant for LMAO, and Armanino LLP ("Armanino") served as principal accountant for SeaStar Legacy.

251. Following the Business Combination, on December 20, 2022, the Company appointed Armanino to serve as principal accountant to audit the combined company's financial statements thereby determining that MaloneBailey would not continue as principal accountant.

252. On December 21, 2022, SeaStar filed a current report on Form 8-K with the SEC describing the changes in the Company's certifying accountant providing, in relevant part, that:

> MaloneBailey's report on LMAO's financial statements for the year ended December 31, 2021, and the period from October 28, 2020 (inception) through December 31, 2020 did not contain an adverse opinion or a disclaimer of opinion, nor was either report qualified or modified as to uncertainty, audit scope or accounting principles.
>
> During the period from October 28, 2020 (LMAO's inception) through December 31, 2020, the year ended December 31, 2021 and the subsequent interim period through December 20, 2022, LMAO did not have any disagreements with MaloneBailey on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreement, if not resolved to the satisfaction of MaloneBailey, would have caused it to make reference to the subject matter of the disagreement in connection with its report. No 'reportable events' (as described in Item 304(a)(1)(v) of Regulation S-K) occurred during the period October 28, 2020 (LMAO's inception) through December 31, 2020, the year ended December 31, 2021 or during the subsequent interim period.

> October 28, 2020 (LMAO's inception) through December 31, 2020, the year ended December 31, 2021 and ***the subsequent interim period through December 20, 2022, LMAO and the Company did not consult Armanino regarding: either the application of accounting principles to a specified transaction***, ***either completed or proposed,*** or the type of audit opinion that might be rendered on LMAO's or the Company's financial statements; or any matter that was either the subject of a disagreement (as described above) or a 'reportable event' (as described in Item 304(a)(1)(v) of Regulation S-K).
>
> (Emphasis added).

253. Notably, MaloneBailey served as LMAO's principal accountant when, as detailed below, the company reported a deficiency in LMAO's internal control over financial reporting existed relating to the accounting treatment of various financial instruments and that the failure to properly account for such instruments constituted a material weakness, resulting in the need to restate LMAO's prior financial statements. Specifically, LMAO reported that "[b]ased on management's evaluation, the Company's Audit Committee, in consultation with management and after discussion with the Company's independent registered public accounting firm, concluded that the Company's Private Placement Warrants are not indexed to the Company's common shares in the manner contemplated by ASC Section 815-40-15 because the holder of the instrument is not an input into the pricing of a fixed-for-fixed option on equity shares," precluding equity classification and requiring the warrants be reclassified as liability.

254. Then, on August 2, 2023, SeaStar announced that on July 31, 2023, Armanino informed the Company that it would resign as the Company's independent registered public accounting firm effective as of the earlier of (i) the date the Company

engages a new independent registered public accounting firm or (ii) the filing of the Company's quarterly report on Form 10-Q for the three-month period ended September 30, 2023.

255. The resignation announcement came just one month after SeaStar investors ratified the appointment of Armanino as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2023, during the Company's annual meeting of stockholders held on June 30, 2023.

256. Included with the Company's FY23 10-K, filed on April 16, 2024, was Armanino's report on SeaStar's financial statement for the fiscal year ended December 31, 2022 updated to reflect "the effects of the Company's restated consolidated financial statements as of and for the year ended December 31, 2022 to correct certain misstatements." Notably absent from the updated report is the following passage from Armanino's report included in the Company's FY22 10-K relating to SeaStar's non-engagement of Armanino to perform an audit of its internal control over financial reporting:

> The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

257. The timing of MaloneBailey's termination just before Defendants began issuing materially misstated financial statements resulting from the same misclassifications previously identified by LMAO and its independent accounting firm, and the sudden resignation of Armanino after what appears to be their engagement to

perform an audit of SeaStar's internal control over financial reporting, and mere months before the Company was forced to disclose various accounting improprieties and the need to restate all post-Business Combination financial results due to the Company's failure to properly apply ASC Topic 815, weigh in favor of the inference of scienter.

258. Likewise, on January 11, 2024, mere months before the Restatement, SeaStar announced that Defendant Baron was "transitioned" to Vice President of Finance, effective January 10, 2024. Then, on April 26, 2024, SeaStar filed an Amendment No. 1 on Form 10-K/A for the fiscal year ended December 31, 2023 (the "Form 10-K/A") to amend the FY23 10-K, filed with the SEC on April 16, 2024. The Form 10-K/A revealed that Ms. Baron's employment was subsequently terminated, effective April 23, 2024—*one* week after the Company filed the Restatement with the SEC. Ms. Baron had served as SeaStar Legacy's Finance Controller since 2020 and was named Interim CFO at the closing of the Business Combination. The timing of Defendant Baron's demotion followed by her swift termination at a time when SeaStar was disclosing various accounting improprieties and internal control deficiencies to the public, weighs further in support of the inference of scienter.

### D. The Company's Prior Restatement of Financial Results Due to Misclassification of Financial Instruments

259. The Company's Restatement is not the only restatement of prior financial results resulting from the misclassification of the same or similar financial instruments.

260. Prior to the closing of the Business Combination, LMAO and its management team were deeply entrenched in the proper accounting classification of the company's IPO-related warrants, including its Private Placement Warrants.

261. On May 18, 2021, LMAO filed with the SEC a Notification of Late Filing on Form 12b-25 explaining that the company had determined it was unable, without unreasonable effort or expense, to file its quarterly for the three-month period ended March 31, 2021 (the "1Q21 10-Q"), by the prescribed due date based on the following reasons:

> On April 12, 2021, the Staff of the U.S. Securities and Exchange Commission (the "SEC") issued the "Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs")" (the "SEC Statement"), which clarified guidance for all SPAC-related companies regarding the accounting and reporting for their warrants. Following review of the SEC Statement, the Company reevaluated the accounting treatment of its public warrants and private placement warrants as equity, and concluded that, based on the SEC Statement, the public warrants and private placement warrants should be, and should previously have been, classified as a liability measured at fair value, with non-cash fair value adjustments recorded in earnings at each reporting period.
>
> The Company is currently determining the extent of the SEC Statement's impact on its financial statements as of and for the period from January 1, 2021 through March 31, 2021 included in the Q1 2021 Form 10-Q (the 'Q1 2021 Financials'). The Company is working diligently to complete the Q1 2021 Form 10-Q as soon as possible; however, given the scope of the process for determining the appropriate treatment of the public warrant and private placement warrants in accordance with the SEC Statement and appropriately reporting such treatment in the Q1 2021 Form 10-Q, the Company is unable to complete and file the Q1 2021 Form 10-Q by the required due date of May 17, 2021 without unreasonable effort and expense. The Company does, however, expect to file such report within five calendar days thereof.

262. On May 24, 2021, LMAO filed its quarterly report for the three-month period ended March 31, 2021 with the SEC on Form 10-Q (the "1Q21 10-Q"). When discussing LMAO's "Controls and Procedures," the report stated, in relevant part:

> Disclosure controls are procedures that are designed with the objective of ensuring that information required to be disclosed in our reports filed under the Exchange Act, such as this Report, is recorded, processed, summarized, and reported within the time period specified in the SEC's rules and forms. Disclosure controls are also designed with the objective of ensuring that such information is accumulated and communicated to our management, including the chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure. Our management evaluated, with the participation of our chief executive officer and chief financial officer (our "Certifying Officers"), the effectiveness of our disclosure controls and procedures as of March 31, 2021, pursuant to Rule 13a-15(b) under the Exchange Act. Based upon that evaluation, our Certifying Officers concluded that, as of March 31, 2021, our disclosure controls and procedures were not effective.
>
> Specifically, management's determination was based on the following material weaknesses which existed as of March 31, 2021: Since inception in 2020 to the present, the Company did not effectively segregate certain accounting duties due to the small size of its accounting staff. In addition, our internal control over financial reporting did not result in effective controls to properly evaluate complex equity transactions. This lack of control led to improper accounting classification of warrants we issued in January 2021 which, due to its impact on our financial statements which we determined to be a material weakness. This mistake in classification was brought to our attention only when the SEC issued a Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs") dated April 12, 2021 (the "SEC Statement"). The SEC Statement addresses certain accounting and reporting considerations related to warrants of a kind similar to those we issued at the time of our initial public offering in January 2021.
>
> A material weakness is a deficiency, or a combination of control deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis. Notwithstanding the determination that our internal control over financial reporting was not effective, as of March 31, 2021, and that there was a material weakness as identified in this Quarterly Report, we

> believe that our financial statements contained in this Quarterly Report fairly present our financial position, results of operations and cash flows for the periods covered hereby in all material respects.

263. On August 16, 2021, LMAO filed its quarterly report for the three-month period ended June 30, 2021 with the SEC on Form 10-Q (the "2Q21 10-Q"). The 2Q21 10-Q contained substantially the same paragraphs identified in the 1Q21 10-Q.

264. On November 16, 2021, LMAO filed with the SEC a Notification of Late Filing on Form 12b-25 explaining that the company had determined it was unable, without unreasonable effort or expense, to file its quarterly for the three-month period ended September 30, 2021, by the prescribed due date based on the following reasons:

> The Company is reevaluating the classification of its ordinary shares (the "Public Shares") subject to possible redemption, which were issued in connection with the Company's initial public offering and the exercise of the underwriter's over-allotment. In particular, Accounting Standards Codification ("ASC") 480-10-S99, *Distinguishing Liabilities from Equity*, requires ordinary shares with redemption features that are not solely within the Company's control to be classified outside of permanent equity. The Company previously determined the Public Shares subject to possible redemption to be equal to the redemption value of $10.00 per Public Share while also taking into consideration the requirement in the Company's amended and restated memorandum and articles of association that a redemption cannot result in the Company's net tangible assets being less than $5,000,001.
>
> In connection with the reevaluation, the Company anticipates that its Public Shares subject to possible redemption will be reclassified as temporary equity in their entirety. This anticipated reclassification would result in an adjustment to the initial carrying value of the Public Shares subject to possible redemption with the offset recorded to additional paid-in capital (to the extent available), accumulated deficit and ordinary shares. The Company also expects to revise its earnings per share ("EPS") calculation to allocate net income (loss) evenly to the redemable and nonredeemable shares. The Company, however, does not expect that such reclassification would change total assets, liabilities or operating results in any prior periods. The Company is concurrently evaluating the

> materiality of the anticipated reclassification and other related accounting matters in accordance with Staff Accounting Bulletin No. 99 and 108.
>
> The Company is working diligently to complete the Q3 2021 Form 10-Q as soon as possible; however, given the scope of the process for determining the appropriate treatment of the redeemable shares in accordance with the SEC Statement and appropriately reporting such treatment in the Q3 2021 Form 10-Q, the Company is unable to complete and file the Q3 2021 Form 10-Q by the required due date of November 15, 2021 without unreasonable effort and expense. The Company does, however, expect to file such report within five calendar days thereof.

265. Then, on November 17, 2021, LMAO filed its quarterly for the three-month period ended September 30, 2021 with the SEC on Form 10-Q (the "3Q21 10-Q"). When discussing the company's "Controls and Procedures," the 3Q21 10-Q provided, in relevant part:

> *<u>Redeemable Equity Instruments</u>*
>
> In accordance with the SEC and its staff's guidance on redeemable equity instruments, which has been codified in ASC 480-10-S99, redemption provisions not solely within the control of the Company require common stock subject to redemption to be classified outside of permanent equity. Although the Company did not specify a maximum redemption threshold, its charter provides that currently, the Company will not redeem its public shares in an amount that would cause its net tangible assets to be less than $5,000,001.
>
> Management reviewed the Company's initial application of ASC 480-10-S99-3A to its accounting classification of public shares and determined that the public shares include certain redemption provisions outside of the Company's control that require the public shares to be presented as temporary equity regardless of the minimum net tangible asset required by the Company to complete its initial business combination.
>
> *<u>Warrants as Derivative Liability</u>*
>
> The Company previously accounted for its outstanding Public Warrants and Private Placement Warrants issued in connection with its IPO as components of equity instead of as derivative liabilities. The warrant agreement governing the Warrant Agreement includes a provision that provides for potential changes to the settlement amounts dependent upon

the characteristics of the holder of the Warrant. In addition, the Warrant Agreement includes a provision that in the event of a tender or exchange offer made to and accepted by holders of more than 50% of the outstanding shares of a single class of common shares, all holders of the Warrants would be entitled to receive cash for their Warrants (the 'tender offer provision').

In connection with the reevaluation of the accounting treatment of the Warrants, the Company's management evaluated the warrants under Accounting Standards Codification ('ASC') Subtopic 815-40, Contracts in Entity's Own Equity. ASC Section 815-40-15 addresses equity versus liability treatment and classification of equity-linked financial instruments, including warrants, and states that a warrant may be classified as a component of equity only if, among other things, the warrant is indexed to the issuer's common stock. Under ASC Section 815-40-15, a warrant is not indexed to the issuer's common stock if the terms of the warrant require an adjustment to the exercise price upon a specified event and that event is not an input to the fair value of the warrant. Based on management's evaluation, the Company's Audit Committee, in consultation with management and after discussion with the Company's independent registered public accounting firm, concluded that the Company's Private Placement Warrants are not indexed to the Company's common shares in the manner contemplated by ASC Section 815-40-15 because the holder of the instrument is not an input into the pricing of a fixed-for-fixed option on equity shares. In addition, based on management's evaluation, the Company's Audit Committee, in consultation with management and after discussion with the Company's independent registered public accounting firm, concluded the tender offer provision included in the Warrant Agreement fails the 'classified in stockholders' equity' criteria as contemplated by ASC Section 815-40-15.

As a result of the above, the Company should have classified the Warrants as derivative liabilities in its previously issued balance sheet as of January 28, 2021 that was filed on Form 8-K on February 3, 2021. Under this accounting treatment, the Company is required to measure the fair value of the Warrants at the end of each reporting period and recognize changes in the fair value from the prior period in the Company's operating results for the current period improper accounting classification of warrants we issued in January 2021 which, due to its impact on our financial statements which we determined to be a material weakness. This mistake in classification was brought to our attention only when the SEC issued a Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs") dated April 12, 2021 (the 'SEC Statement'). The SEC Statement

addresses certain accounting and reporting considerations related to warrants of a kind similar to those we issued at the time of our initial public offering in January 2021.

In accordance with SEC Staff Accounting Bulletin No. 99, 'Materiality,' and SEC Staff Accounting Bulletin No. 108, 'Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements;' the Company evaluated the changes and has determined that the related impact was material to any previously presented financial statements. Therefore, the Company, in consultation with its Audit Committee, concluded that its previously issued financial statements should be restated to report all public shares as temporary equity and warrants should be classified and measured as derivative liabilities.

*(a) Evaluation of disclosure controls and procedures.*

Disclosure controls are procedures that are designed with the objective of ensuring that information required to be disclosed in our reports filed under the Exchange Act, such as this Report, is recorded, processed, summarized, and reported within the time period specified in the SEC's rules and forms. Disclosure controls are also designed with the objective of ensuring that such information is accumulated and communicated to our management, including the chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure. Our management evaluated, with the participation of our chief executive officer and chief financial officer (our "Certifying Officers"), the effectiveness of our disclosure controls and procedures as of September 30, 2021, pursuant to Rule 13a-15(b) under the Exchange Act. Based upon that evaluation, our Certifying Officers concluded that, as of September 30, 2021, our disclosure controls and procedures were not effective.

Specifically, management's determination was based solely on the following material weaknesses which existed as of September 30, 2021. Since inception in 2020 to the present, the Company did not effectively segregate certain accounting duties due to the small size of its accounting staff. In addition, we did not have sufficient controls in place surrounding the accounting of complex financial instruments. This lack of control led to improper accounting classification of warrants we issued in January 2021 which, due to its impact on our financial statements. This lack of control led to improper accounting classification of warrants we issued in January 2021 which we determined to be a material weakness. This mistake in classification was brought to our attention only when the SEC issued a

> Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs") dated April 12, 2021 (the "SEC Statement"). The SEC Statement addresses certain accounting and reporting considerations related to warrants of a kind similar to those we issued at the time of our initial public offering in January 2021.
>
> A material weakness is a deficiency, or a combination of control deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.
>
> In connection with the evaluation of the SEC Statement and management's subsequent re-evaluation of its Prior Financials, the Company determined that there were errors in its accounting for its warrants and shares as temporary equity. Management concluded that a deficiency in internal control over financial reporting existed relating to the accounting treatment for complex financial instruments and that the failure to properly account for such instruments constituted a material weakness. This material weakness resulted in the need to restate the Prior Financials.
>
> Notwithstanding the determination that our internal control over financial reporting was not effective, as of September 30, 2021, and that there was a material weakness as identified in this Quarterly Report, we believe that our financial statements contained in this Quarterly Report fairly present our financial position, results of operations and cash flows for the periods covered hereby in all material respects.

266. Notably, when discussing LMAO's accounting of "*Warrants as Derivative Liability*," the company detailed the contractual terms and provisions governing the Private Placement Warrants requiring the warrants to be classified as derivative liabilities as opposed to a component of equity—*i.e.*, the provisions "identical" to those governing the PIPE Warrants.

267. On April 6, 2022, LMAO filed its annual report for the fiscal year ended December 31, 2021 with the SEC on Form 10-K ("FY21 10-K")—while SeaStar Legacy and LMAO were well into substantive discussions and conducting due diligence. When discussing the previously identified material weakness in internal control over financial reporting, LMAO explained that, "we plan on increasing the size of our accounting staff at the appropriate time for our business and its size to ameliorate our auditor's concern that the Company does not effectively segregate certain accounting duties, which we believe would resolve the material weakness in internal control over financial reporting and similarly improve disclosure controls and procedures…" The company's FY21 10-K went on to state that, "[c]hanges may include such activities as implementing new, more efficient systems, consolidating activities, and migrating processes."

268. On May 19, 2022, LMAO filed its quarterly report for the three-month period ended March 31, 2022 on Form 10-Q ("1Q22 10-Q"); on August 16, 2022, LMAO filed its quarterly report for the three-month period ended June 30, 2022 on Form 10-Q ("2Q22 10-Q"); and on November 14, 2022, LMAO filed its quarterly report for the three-month period ended September 30, 2022 on Form 10-Q ("3Q22 10-Q"), prior to the October 28, 2022 closing of the Business Combination with SeaStar Legacy. LMAO's 1Q22, 2Q22, and 3Q22 10-Q each contained substantially the same paragraphs identified in the company's 3Q21 10-Q relating to the prior misclassification of the company's warrants resulting in a restatement.

269. Thus, Defendants knew, or at minimum recklessly disregarded, the proper classification of the Company's warrants when evaluating and implementing ASC Topic

815 during the Class Period, and the material risk of restatement as a result of misclassification.

**E. The Magnitude of the Restatement**

270. The scope and financial magnitude of the Restatement demonstrates that Defendants acted with knowledge and/or reckless disregard throughout the Class Period when they failed to report financial results in accordance with GAAP and consistent with the requirements of ASC Topic 815. As alleged herein, this is not an instance where a publicly traded company was required to make non-material adjustments to its historical financial results in order to account for minor misapplications of applicable accounting principles. To the contrary, as a result of Defendants complete failure to follow the definitions and measurements laid out in ASC Topic 815, SeaStar was required to issue restated financial results for fiscal year ended 2022 and the first three fiscal quarters of 2023 that diverged significantly from the prior results the Company reported to investors. Defendants' failure to comply with ASC Topic 815 caused the Company to overstate its total assets by 36% while also understating its total liabilities by nearly 200%. In addition, the restated results demonstrate that SeaStar's shareholder deficit was understated by almost 250%. Collectively, the revised financial statements issued in connection with the Restatement paint a dramatically different picture of SeaStar's financial position, as well as the Company's value proposition for investors.

271. Accordingly, the magnitude of the Restatement coupled with Defendants' failure to carry out their obligations to design and implement effective internal control

over financial reporting, demonstrate that Defendants acted with scienter when failing to report financial results in accordance with GAAP and consistent with the requirements of ASC Topic 815.

### F. The Individual Defendants' High-Level Positions and Access to Information

272. As alleged herein, Defendants acted with scienter in that they knew, and/or recklessly disregarded, that the public statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated and acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding SeaStar's business, operations, and future prospects, and/or their control over SeaStar's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

273. Because of their positions within SeaStar Legacy and subsequently SeaStar, the Individual Defendants had access to non-public information about the Company's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their

possession of such information, the Individual Defendants knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

274. The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential information concerning the Company and its business, operations, financial statements, financial condition, and future prospects, as alleged herein.

275. For example, during the due diligence process prior to the Business Combination, the Individual Defendants had access to and were privy to material confidential information concerning SeaStar Legacy's regulatory approval process and the prior accounting of LMAO's Public Warrants and Private Placement Warrants, identical in all material terms and provisions to the Company's PIPE Warrants.

276. According to the Prospectus Supplement, on February 23, 2022, SeaStar Legacy's executive management (including the Individual Defendants) and Morgan Lewis & Bockius LLP, SeaStar Legacy's legal counsel, reviewed and discussed the non-binding letter of intent sent by LMAO with members of the SeaStar Special Committee, with particular discussions around valuation, capital structure, allocation of expenses and the treatment of convertible notes and stock options. SeaStar Legacy's executive management team also continued to work with Maxim to revise and finalize the letter of intent.

277. The Prospectus Supplement went on to state that, prior to the execution of the Merger Agreement, LMAO representatives held several telephonic meetings with SeaStar Legacy and its representatives to discuss regulatory and intellectual property diligence. During this period, the LMAO management team also held multiple telephonic meetings with the SeaStar Legacy's management team (including the Individual Defendant) to discuss SeaStar Legacy's product roadmap, commercialization strategy, technology, manufacturing plans, and other relevant business topics.

278. In particular, on February 28, 2022 and March 1, 2022, LMAO's management team met with representatives from SeaStar Legacy and its financial advisor, Maxim, during which the parties discussed SeaStar Legacy's business model, product candidates and regulatory timeline. From March 3, 2022 to April 21, 2022, representatives of LMAO and its advisors conducted further analysis and held additional conference calls with representatives of SeaStar Legacy regarding SeaStar Legacy's business plan, regulatory approval process, financial projections and technology. On March 7-8, 2022, LMAO management met Defendant Schlorff, and representatives from Maxim, in person to discuss the proposed Business Combination and related business and diligence concerns. From March 10, 2022 through April 22, 2022, both parties and their advisors purportedly held weekly all hands calls to discuss the proposed Business Combination, diligence and related matters.

279. Likewise, the May 2023 Press Release, announcing the FDA's non-approvable letter, quoted Defendant Schlorff as stating, in relevant part: "We are disappointed by the FDA's decision not to approve our HDE application at this time.

After a series of collaborative meetings and correspondence over the past 10 months, and repeatedly being responsive to the Agency's recommendations, this determination is surprising[.]"

280. Accordingly, the Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent activity alleged herein could not have been perpetrated during the Class Period without the knowledge and complicity, or at least the reckless disregard, of the officers at the highest levels of the Company, including the Individual Defendants.

### G. The Regulatory Approval Process Was Critical to SeaStar's Core Operations

281. SeaStar's continued existence was heavily dependent on its ability to gain FDA approval of the HDE application for the commercialization of its lead product, the SCD. Until February 22, 2024, SeaStar had not obtained regulatory approval to commercialize or sell any of its products candidates. As such, SeaStar had not generated any significant revenue from the sale of commercialized products. The Company's ability to generate revenue was dependent on the successful development and eventual commercialization of its product candidates. In addition, SeaStar was dependent on the Subscription Agreements and Forward Purchase Agreements to provide much needed capital during the FDA approval process. Without such funding, SeaStar faced difficulty in continuing as a going concern, as noted in its public filings.

282. Accordingly, it is appropriate to presume that the Individual Defendants were apprised of, had access to, or had actual knowledge of all material information related to SeaStar's business operations and financial condition during the Class Period, including the material adverse information that was improperly withheld and/or mispresented to investors.

**H. SEC Correspondence Indicated Misleading Nature of Defendants Statements**

283. Prior to the Class Period, on May 16, 2022, LMAO filed the initial Registration Statement on Form S-4, File No. 333-264993, which provided, in relevant part:

> As of April 30, 2022, our SCD has been used in approximately 170 adult and pediatric patients on an investigational basis. We are currently preparing a submission of a Humanitarian Device Exemption ('HDE') request for pediatric patients with acute kidney injury on CRRT that is expected to be completed in the first half of 2022. Based on the current timeline of the HDE, we expect to obtain regulatory approval of our SCD product candidate for pediatric patients during the first quarter of 2023.

284. On June 13, 2022, the SEC sent a letter to Mr. Rodgers, CEO of LMAO, including specific comments regarding certain provisions contained in the initial Registration Statement, including Comment 17: SeaStar Medical's Business, page 137, which read:

> In the first full paragraph on page 138, revise your timeframes for expected completion of your HDE request to instead disclose when you expect to submit the request to the FDA. We note the current disclosure is that you intend to complete your submission of the HDE request in the first half of 2022 and it is now June 2022. Also, we note the statement, 'we expect to obtain regulatory approval of our SCD product candidate for pediatric patients in the first quarter of 2023.' You should not suggest or imply that this or any product will be approved by the FDA. Please revise

> your disclosure here and any similar statements throughout the prospectus accordingly.

285. On July 11, 2022, Foley & Lardner LLP, on behalf of LMAO, sent a response letter to the SEC providing the following response to Comment 17:

> In response to the Staff's comment, the Company has revised the disclosure throughout the Amended Registration Statement to update the timeframes for the HDE application, including on page 160. In addition, the Company has revised the disclosure throughout the Amended Registration Statement to eliminate statements implying that any product candidates under development will be approved by the FDA, including on page 160.

286. Accordingly, prior to the start of the Class Period, Defendants were made aware and conceded that it was improper to suggest or imply that SeaStar's SCD product would be approved by the FDA and that approval could be expected in a specific timeframe, at the risk of materially misleading the public.

### I. Defendants' Financial Motive to Commit Fraud

287. SeaStar Legacy desperately needed working capital and LMAO needed a target company that met its valuation requirements to consummate a business combination.

288. Developing medical device products like SeaStar's SCD, including conducting preclinical studies and clinical trials and completing the regulatory approval process necessary to achieve commercialization, is expensive. Prior to the consummation of the Business Combination, SeaStar Legacy expected its research and development expenses to substantially increase in connection with its ongoing activities, particularly as it advanced its clinical programs and regulatory approval process.

289. However, SeaStar Legacy was running out of cash. As of June 30, 2022 and December 31, 2021, SeaStar Legacy had negative working capital of approximately $2.4 million and $2.5 million and net operating losses of approximately $78.1 million and $23.1 million, respectively, and its audit report in its 2021 financial statements contained an emphasis-of-matter paragraph, stating that its recurring losses from operations and cash used in operating activities raised substantial doubt as to SeaStar Legacy's ability to continue as a going concern. SeaStar Legacy had not generated any revenue to date and any future opportunity for generating revenue was dependent on receiving FDA approval of its lead product candidate, the SCD.

290. According to the Prospectus Supplement, if SeaStar Legacy was unable to raise additional capital in sufficient amounts or on acceptable terms, by way of the Business Combination and related private investments, or other unspecified means, SeaStar Legacy "will be prevented from pursuing development and commercialization efforts, including completing the clinical trials and regulatory approval process for its SCD product candidates, which would have a material adverse impact on its business, results of operations and financial condition." Accordingly, SeaStar Legacy's future operations were dependent on the success of its ongoing development and commercialization efforts, as well as its ability to complete the Business Combination with LMAO.

291. On August 14, 2021, SeaStar Legacy engaged Maxim to provide financial advisory and investment banking services, including assistance with preparing for a potential business combination with a SPAC or another transaction, including a possible

IPO. In such capacity, representatives of Maxim assisted SeaStar Legacy with, among other things, discussing and evaluating possible transaction structures and strategic alternatives for SeaStar, Legacy performing due diligence, and assisting SeaStar Legacy with the preparation and review of corporate presentation and marketing materials.

292. Prior to its engagement by SeaStar Legacy, on March 4, 2021, Maxim was also engaged by LMAO to provide LMAO due diligence and advisory services in the capacity as LMAO's exclusive financial advisor with respect to its initial business combination. In such capacity, Maxim assisted LMAO with identifying and evaluating prospective target companies, including by facilitating meetings with prospective acquisition targets and by introducing LMAO to advisors of companies with potential interest in pursuing a business combination with a SPAC.

293. On September 23, 2021, a representative of Maxim, on behalf of SeaStar Legacy, made the initial contact with LMAO's management team about the merits of a potential business combination of the two companies. However, as detailed above, at that time, LMAO believed that the other target companies under review were more desirable acquisition candidates and declined to engage in substantive discussions with SeaStar Legacy.

294. Then, on February 8, 2022, as LMAO's substantive discussions with other "more desirable acquisition candidates" came to an end without resulting in a viable business combination, a representative of Maxim, on behalf of SeaStar Legacy, contacted LMAO's management team again regarding a potential business combination

with SeaStar Legacy, and purportedly providing the LMAO management team with further information about SeaStar Legacy and its lead product candidate, the SCD.

295. On February 10, 2022, SeaStar Legacy's executive management team (including the Individual Defendants) and its representatives from Maxim, participated in a videoconference with LMAO's management team, at which point Defendants informed LMAO that, *inter alia*, SeaStar Legacy had substantially completed its PCAOB audit and was seeking a pre-money enterprise value of $85 million.

296. Defendants were highly motivated to increase SeaStar Legacy's valuation for specific reasons, given the Company's dire financial condition before the Business Combination. Indeed, without an $85 million valuation of SeaStar Legacy, a business combination with LMAO would not have been possible. Following the completion of its IPO, LMAO placed roughly $105.5 million in the company's trust account. Nasdaq rules required that LMAO complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account at the time of signing a definitive agreement in connection with the company's initial business combination. Conventionally, the $85 million valuation of SeaStar Legacy exceeded LMAO's 80% requirement at $84.5 million.

297. Around mid-April 2022, LMAO engaged Skyway as LMAO's financial advisor for the purpose of reviewing SeaStar Legacy's financial models and projections, and to provide valuation and financial advice to the LMAO Board.

298. On April 20, 2022, the LMAO Board held a conference call with representatives from Skyway during which Skyway presented the Board with its

financial analysis regarding SeaStar Legacy, its potential market opportunities and the valuation of the proposed Business Combination based on the projections provided by SeaStar Legacy and based primarily on the valuation of other purportedly comparable companies. SeaStar Legacy's regulatory status was a primary contributor to Skyway's valuation of SeaStar Legacy and a deciding factor for successful execution of the Business Combination.

299. The Prospectus Supplement described the factors LMAO's Board primarily relied upon when assessing the value of SeaStar Legacy, which included a comparison to small and large cap publicly traded companies in the healthcare and medical device sectors, selected by Skyway based on the information provided by Defendants regarding SeaStar Legacy's lead product candidate, the SCD, and other projections. When discussing this review process, the Prospectus Supplement provided, in relevant part, that:

> The Board relied primarily on a comparable company analysis, as opposed to a discounted cash flow analysis, because the Board believed that comparable company valuations are a more accurate gauge of valuation for a pre-revenue medical device company such as SeaStar Medical. Specifically, ***a comparable company analysis enabled the LMAO Board to focus on comparable companies that have medical device products and/or product candidates with market profiles and/or regulatory pathways that are similar or analogous to SeaStar Medical***, as the Board believed that the nature of SeaStar Medical's product candidate in conjunction with its regulatory strategy was an important element of the future value of SeaStar Medical. In addition, notwithstanding the relatively small size of SeaStar, Skyway included certain large cap company valuations in its valuation analysis, which the Board thereafter incorporated into its overall review, as ***the Board believes that SeaStar Medical's SCD technology represents a broadly applicable platform technology that is already in a later stages of the FDA-review process for the pediatric market***.

(Emphasis added).

300. The small cap companies considered "comparable" to SeaStar Legacy, based on information provided by Defendants, were CorMedix, Inc., Cytosorbents Corporation, and Spectral Medical Inc.

301. As of April 21, 2022, the date the Merger Agreement was executed, CorMedix had already submitted a New Drug Application ("NDA") to the FDA for its lead candidate and had received two Complete Response Letters from the FDA requiring NDA resubmissions, with the last resubmission accepted for filing on March 28, 2022.

302. Cytosorbents' flagship product, CytoSorb, has been approved for commercialization in the European Union ("EU") since March 2011; with label expansion approval received in January 2020 and May 2020. The FDA granted Emergency Use Authorization of CytoSorb for use in critically-ill patients with COVID-19 in April 2020 and remained in effect as of March 2022. In October 2020, the EU also approved the company's ECOS-300CY cartridge, which went into commercialization in 2021. In April 2020, the FDA granted the company Breakthrough Device Designation ("BDD") for CytoSorb and in July 2021, it received full approval of its application for Investigational Device Exemption ("IDE") to conduct its pivotal trial study to support final approval by the FDA. In August 2021, the company also received BDD for its DrugSorb-ATR and in October 2021, it received full approval of its IDE to conduct its pivotal trial study to support final approval by the FDA.

303. Spectral Medical's flagship product, Toraymyxin (PMX) is approved for therapeutic use in Japan, Europe, and the U.S. In March 2009, Spectral obtained the

exclusive development and commercial rights in the U.S. for PMX. In August 2020, Spectral, through its wholly own subsidiary, Dialco Medical, Inc., received FDA 510k clearance for use of its product, DIMI, in hospital and clinical settings. In February 2021, Spectral received full approval of its IDE for DIMI to conduct a trial from home use, and in March 2021, the company received Health Canada License for DIMI in hospital settings.

304. Conversely, prior to the Business Combination, SeaStar Legacy had not obtained regulatory approval to commercialize or sell *any* of its product candidates. Additionally, SeaStar Legacy did not submit its first pre-approval application to the FDA until more than two months *after* the companies executed the Merger Agreement. And as later revealed, before the Class Period began, SeaStar Legacy was already experiencing delays in its regulatory approval process due to FDA-identified deficiencies in its HDE application, significantly jeopardizing the Company's path to timely commercialization.

305. Based on the foregoing, SeaStar Legacy was under immense pressure to raise working capital through the consummation of the Business Combination with LMAO. Without this capital, as admitted, SeaStar Legacy would have been unable to continue operations. Similarly, without shareholder approval of the merger with SeaStar Legacy, LMAO was at substantial risk of failing complete an initial business combination in the allotted about of time which would have resulted in the dissolution of the SPAC and the money in the company's trust account returned to its investors, with no compensation paid to the founders and managers. Thus, Defendants ability to maintain

a façade of operational success and significant progress in terms of SeaStar's regulatory approval process was paramount; disclosing any known deficiencies in the Company's HDE application or altering the projected timeline for commercialization in anyway would have severely jeopardized Defendants' ability to obtain the much needed working capital (if not killed it altogether).

306. SeaStar Legacy's need for working capital and, in turn, the Company's need to maintain a successful image with investors following the consummation of the Business Combination, provided Defendants with motive and opportunity to commit the fraud alleged herein. Given SeaStar Legacy's financial straits, this motive surpassed any ordinary or generic corporate motive to raise funds.

## VII. LOSS CAUSATION AND ECONOMIC LOSS

307. During the Class Period, SeaStar securities traded publicly on a national exchange, the NASDAQ. The market for SeaStar securities was open, well-developed and efficient at all relevant times.

308. Throughout the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of SeaStar's securities and operated as a fraud or deceit on Class Period purchasers and/or acquirers of SeaStar's securities by materially misleading the investing public. By issuing materially false and misleading financial and FDA approval statements, among other adverse facts detailed herein, Defendants presented a false and/or misleading picture of SeaStar's business and operations. Defendants' false and misleading statements alleged herein

had the intended effect and caused SeaStar's securities to trade at artificially inflated levels throughout the Class Period.

309. Reasonably relying on the integrity of the market price of SeaStar securities and market information relating to SeaStar's business and operations, Plaintiff and other members of the Class purchased or otherwise acquired SeaStar securities at artificially inflated prices during the Class Period. When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of SeaStar's securities materially declined, as the prior artificial inflation dissipated. As a result of their purchases or acquisitions of SeaStar's securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws, which were proximately caused by Defendants' materially false and misleading statements made to the investing public.

310. Indeed, as described in detail above, when the truth about the Company leaked out through a series of partial corrective disclosures, the inflation that was a direct result of Defendants' Class Period misrepresentations and fraudulent conduct, was eliminated as SeaStar's securities reacted to information in the market.

311. The timing and magnitude of the declines in price of SeaStar securities were not caused by changed market conditions, macroeconomic or industry factors, or non-SeaStar specific facts unrelated to Defendants' fraudulent conduct, as alleged herein.

## VIII. NO STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

312. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. The statements alleged to be false and/or materially misleading herein all related to then-existing facts or conditions. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

313. Defendants are also liable for any false or misleading "forward-looking statements" pleaded herein because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer and/or director of SeaStar who knew that the "forward-looking statement" was false or misleading.

314. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the

defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## IX. PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET DOCTRINE

315. At all relevant times, the market for SeaStar securities was an efficient market for the following reasons, among others:

(a) SeaStar securities met the requirements for listing and were listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) As a regulated issued, SeaStar filed periodic public reports with the SEC and the NASDAQ;

(c) SeaStar communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) SeaStar was followed by securities analysts employed by brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(e) Unexpected material news about SeaStar was reflected in and incorporated into the Company's stock price during the Class Period.

316. As a result of the foregoing, the market for SeaStar's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in SeaStar's stock price. Under these circumstances, all purchasers of SeaStar's securities during the Class Period suffered similar injury through their purchase of SeaStar's securities at artificially inflated prices, and a presumption of reliance applies.

317. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## X. <u>CLASS ACTION ALLEGATIONS</u>

318. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased or otherwise acquired SeaStar securities during the Class Period (the "Class").

319. Excluded from the Class are (a) all Defendants and their immediate families; (b) current and former directors or officers of SeaStar or LMAO and their immediate families; (c) any entity that has entered into a stockholder agreement or co-venture agreement with SeaStar, or was a Private Investment in Public Equities ("PIPE") investor in SeaStar; (d) and each of the foregoing persons' legal representatives, heirs, successors or assigns, and any entity controlled, majority-owned or wholly owned, or affiliated with any of the above all persons who purchased or otherwise acquired SeaStar securities during the Class Period.

320. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, SeaStar securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SeaStar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

321. Plaintiff's claims are typical of the claims of the members of the Class as all members are similarly affected by Defendants' wrongful conduct in violation of the federal laws as complained of herein.

322. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

323. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of SeaStar;

(c) whether the Individual Defendants caused SeaStar to issue false and misleading statements during the Class Period;

(d) whether the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements during the Class Period;

(e) whether the prices of SeaStar securities during the Class Period were artificially inflated because of SeaStar's and the Individual Defendants' wrongful conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

324. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. CLAIMS FOR RELIEF

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

***(Against All Defendants)***

325. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

326. This Count is asserted against Defendants SeaStar, Schlorff, and Baron and is based upon violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

327. During the Class Period, the Defendants identified herein engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff

and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of SeaStar securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire SeaStar securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, SeaStar and the Individual Defendants, and each of them, took the actions set forth herein.

328. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants identified herein participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for SeaStar's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

329. By virtue of their positions at the Company, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to each of the Individual Defendants. Said acts and omissions of the Defendants identified herein were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly

disregarded that material facts were being misrepresented or omitted as described above.

330. Information showing that the Defendants identified herein acted knowingly or with reckless disregard for the truth is peculiarly within their knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of SeaStar's internal affairs.

331. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to SeaStar's business, operations, financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of SeaStar securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by the Defendants identified herein, Plaintiff and the other members of the Class purchased or otherwise acquired SeaStar securities at artificially inflated prices and relied upon the price of the Company's stock, the integrity of the market for SeaStar's securities and/or upon statements disseminated by the Defendants identified herein, and were damaged thereby.

332. During the Class Period, SeaStar securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants identified herein made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of SeaStar securities at prices artificially inflated by SeaStar's and the Individual Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of SeaStar's securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of SeaStar's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and the Class members.

333. By reason of the conduct alleged herein, the Defendants identified herein knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

334. As a direct and proximate result of SeaStar's and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of SeaStar securities during the Class Period, upon the disclosure that the Company had

been disseminating misrepresented financial and business operation statements to the investing public.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**

***(Against the Individual Defendants)***

335. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

336. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about SeaStar's misstatements.

337. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by SeaStar which had become materially false or misleading.

338. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SeaStar disseminated in the marketplace during the Class Period containing the alleged misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause SeaStar to engage in the wrongful acts complained of herein. The Individual Defendants,

therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SeaStar's securities.

339. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same, to cause SeaStar to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

340. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the primary violations committed by the Company.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as a class representative and Plaintiff's counsel as Class Counsel;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XIII. DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 4, 2025

Respectfully submitted,

LEVI & KORSINSKY, LLP

*s/ Adam M. Apton*

Adam M. Apton
Devyn R. Glass
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com
dglass@zlk.com

*Attorneys for Lead Plaintiff and Lead Counsel for the Class*